## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| VALERIA V. GUNKOVA, | ) Case No. 23-11261 (BFK) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) |
| | ) |
| HARRY KAMIN, | ) |
| Individually and on behalf of BNG Group LLC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Adv. Proc. No. _____ |
| | ) |
| VALERIA V. GUNKOVA, | ) |
| Serve: | ) |
|     Valeria V. Gunkova | ) |
|     20701 Riptide Sq. | ) |
|     Sterling, VA 20165 | ) |
| | ) |
| Defendant. | ) |
| | ) |

### COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Harry Kamin, both individually and derivatively on behalf of BNG Group LLC (collectively "**Plaintiffs**"), by and through counsel, bring their Complaint against Defendant Valeria V. Gunkova ("**Ms. Gunkova**" or "**Defendant**") and allege as follows:

Marc E. Albert, No. 26096
Tracey M. Ohm, No. 77150
STINSON LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 728-3020; Fax (202) 572-9943
marc.albert@stinson.com
tracey.ohm@stinson.com

Bethany R. Benes, No. 85408
BETHUNE BENES, PLLC
3975 Fair Ridge Drive
South Suite 246
Fairfax, Virginia 22033
Tel.: (703) 260-9322
bbenes@bethunebenes.com

*Counsel for Harry Kamin, individually and on behalf of BNG Group LLC*

## JURISDICTION

1.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334(b), and 11 U.S.C. § 523.  This case arises out of a Chapter 11 petition filed by Ms. Gunkova in the United States Bankruptcy Court for the Eastern District of Virginia, Case No. 23-11261-BFK.

2.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the Plaintiffs consent to the entry of final orders or judgments by the Bankruptcy Court.

3.     Venue is proper pursuant to 28 U.S.C. § 1409(a).

## PARTIES

4.     Plaintiff BNG Group LLC ("**BNG**") is a limited liability company registered to do business in Virginia, with its registered principal office located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165.

5.     Plaintiff Harry Kamin ("**Mr. Kamin**") is a resident of the state of Florida.

6.     Mr. Kamin is a 50% Class A Member of BNG.

7.     Defendant Ms. Gunkova a resident of the Commonwealth of Virginia residing at 20701 Riptide Sq., Sterling, Virginia 20165.

8.     Ms. Gunkova is the other 50% Class A Member of BNG.

9.     Ms. Gunkova has contended she was the sole manager of BNG, a claim disputed by Mr. Kamin as co-manager.

10.    On October 23, 2023, Mr. Kamin and Ms. Gunkova agreed to appoint a Chief Restructuring Officer for BNG in Ms. Gunkova's personal bankruptcy case.  The application to employ the Chief Restructuring Officer is currently pending before this Court.

## FACTS

11.    Ms. Gunkova is also the sole owner of Skin Logic LLC, VNJ Management LLC, and Sterling Investments LLC.

12.     Skin Logic LLC d/b/a Aria MediSpa ("**ARIA**") is a limited liability company registered to do business in the Commonwealth of Virginia, with its principal place of business located at 2 Pidgeon Hill Drive, Suite 100, Sterling, Virginia 20165.  As admitted by Ms. Gunkova under oath on numerous occasions, Mr. Kamin is not and never has been a member of ARIA.

13.     VNJ Management LLC ("**VNJ**") is a limited liability company registered to do business in the Commonwealth of Virginia, with its principal place of business located at 2 Pidgeon Hill Drive, Suite 110, Sterling, Virginia 20165.

14.     Sterling Investment LLC ("**Sterling Investment**") is a limited liability company registered to do business in the Commonwealth of Virginia, with its principal place of business located at 2 Pidgeon Hill Drive, Suite 120, Sterling, Virginia 20165.

15.     Ms. Gunkova operates Skin Logic LLC, VNJ Management LLC, and Sterling Investments LLC together with her boyfriend Jacob Bogatin ("**Mr. Bogatin**").

16.     Upon information and belief, Ms. Gunkova, with the assistance of Mr. Bogatin (whom Ms. Gunkova holds out to be her husband even though Mr. Bogatin is legally married to Galina Bogatin), formed ARIA in or around 2010 to operate a wellness spa in Loudoun County.

17.     On or about February 25, 2013, ARIA entered into Deed of Lease with then owner of the Building CSG Countryside LLC to lease office space in the commercial building located at 2 Pidgeon Hill Drive, Sterling, Virginia 20165 (the "**Building**").  Pursuant to the Deed of Lease, ARIA agreed to pay 18% interest per year until paid on any rent not paid within 6 days of its due date and all attorney's fees incurred in enforcing the terms of the Deed of Lease.

18.     On or about February 10, 2015, ARIA entered into a First Amendment to Lease Agreement with Liber LLC, the successor in interest of the Building to CSG Countryside LLC. Pursuant to the First Amendment to Lease Agreement, the terms previously agreed to by ARIA with regards to interest and attorney's fees remained in full force and effect.

3

19.    On or about March 17, 2017, ARIA entered into a Second Amended to Office Lease Agreement with Judicial Drive Property Holding LLC (the "**Lease**") to lease Suites 100, 110, 120, 170, 180, 240, and 260 in the Building.   Pursuant to the Second Amended to Office Lease Agreement, the terms previously agreed to by ARIA with regards to interest and attorney's fees remained in full force and effect.

20.    As a result of the purchase of the Building by BNG on October 30, 2020, BNG was assigned all rights as the owner of the Building to the Lease.

21.    Since in or around February of 2013, ARIA has operated its business in the Building.  In each of its amendments, ARIA obtained additional space within the building and the amount owed by ARIA for rent and expenses increased.

22.    Pursuant to the Lease, ARIA agreed to pay rent (including a monthly condo fee) in the amount of $26,712.30 from January 1, 2018, to December 31, 2022.

23.    Pursuant to the Lease, ARIA agreed to pay rent (including a monthly condo fee) in the amount of $28,238.71 from January 1, 2023 to December 1, 2027.

24.    While only a mere tenant of the Building and not an owner, Ms. Gunkova and ARIA made improvements to the suites leased by ARIA in the building from 2013 to 2019, including but not limited to construction performed by PRC Construction Inc.

25.    Sometime in 2019, Ms. Gunkova was advised by then-owner of the Building, Judicial Drive Property Holding LLC (the "**Prior Owner**"), that it wanted to sell the Building. Realizing that all of the improvements made to the ARIA leased suites belonged to the Prior Owner as built-in fixtures of the Building and were therefore subject to transfer upon the sale of the Building (and that ARIA would potentially lose the use of those improvements and its leased suites), Ms. Gunkova, on behalf of ARIA and with the assistance of Mr. Bogatin, attempted to purchase the Building.

4

26.    Mr. Bogatin and Ms. Gunkova contacted Matthew Harris ("**Mr. Harris**") of REIL Capital LLC to assist in obtaining financing for ARIA to complete the purchase.  However, as a result of Ms. Gunkova's low credit score and debt, and ARIA's insufficient business assets and income, Ms. Gunkova and ARIA were denied financing for the purchase of the Building.

27.    Not wanting to give up on the opportunity to purchase the Building, Ms. Gunkova and Mr. Bogatin conspired to create a new company to purchase the Building.  However, as set forth in the Grand Jury Superseding Indictment attached hereto as **Exhibit 1,** Mr. Bogatin had been indicted by a grand jury on no less than forty-five (45) felony charges including (i) RICO conspiracy, (ii) wire fraud, (iii) mail fraud, (iv) securities fraud, (v) filing false reports with the SEC, (vi) falsification of books and records, (vii) money laundering conspiracy, (viii) and money laundering.[1]  Knowing that Ms. Gunkova and ARIA's financial condition was insufficient to obtain a loan, and that Mr. Bogatin's criminal charges would impede financing, Ms. Gunkova and Mr. Bogatin together decided that they would lure in a new partner to join the new company to provide the financial backing and clout to purchase the Building.

28.    Ms. Gunkova and Mr. Bogatin created BNG on or about September 15, 2019 as a limited liability company in the Commonwealth of Virginia, with Ms. Gunkova being the sole member of BNG.  Upon information and belief, Mr. Bogatin was not included as a member out of fear that his known association with the new company and his pending criminal charges would destroy any chances of obtaining financing for the new company.

29.    Mr. Bogatin and Ms. Gunkova discussed potential victim investors and after other investors declined to participate, Mr. Bogatin and Ms. Gunkova ultimately agreed upon Mr. Kamin, whom Mr. Bogatin had known through one of Mr. Kamin's other businesses.  Mr. Bogatin

---

[1] The criminal case remains pending against Mr. Bogatin as of the filing of this Complaint.

CORE/3529060.0002/185282874.1

knew that Mr. Kamin was a successful businessman and as a result, that Mr. Kamin would be able to provide the legitimacy that financial institutions indicated they would need to provide any loan for the purchase of the Building.

30.    In or about February 2020, Defendant Mr. Bogatin appeared at Mr. Kamin's home to further his and Ms. Gunkova's plan.  Mr. Bogatin indicated that Ms. Gunkova was interested in buying the Building, that she had formed BNG to do so, that BNG was a legitimate company that rented office space located at Suite 120 of the Building, and that Ms. Gunkova and BNG needed Mr. Kamin's financial assistance and partnership to accomplish the purchase.  Mr. Bogatin, on behalf of Ms. Gunkova, represented that Mr. Kamin would be made a 50% Class A Member and Manager of BNG if he provided a $150,000 payment for the purchase of his membership interest.  Mr. Bogatin, on behalf of Ms. Gunkova, also represented that as Manager, Mr. Kamin would have full access to all Company bank accounts and that no decisions with regards to the Company would be made without Mr. Kamin's approval.  Mr. Kamin, not knowing at that time about Mr. Bogatin's criminal activity, indicated that he would consider Ms. Gunkova's proposal and Mr. Bogatin's representations on behalf of Ms. Gunkova.

31.    To further Ms. Gunkova and Mr. Bogatin's plan, Mr. Bogatin returned to Mr. Kamin's home on a second day.  During the visit, Mr. Bogatin, in furtherance of his plan with Ms. Gunkova, spent several hours trying to convince Mr. Kamin to go into business with Ms. Gunkova.  Mr. Bogatin, on behalf of Ms. Gunkova, repeated Ms. Gunkova's prior representations that Mr. Kamin would be made a 50% Class A Member and Manager of BNG, have full access to the Company's bank accounts, and decision-making power for the Company.  Mr. Kamin agreed that he would visit to tour the Building and meet Ms. Gunkova in further consideration of Mr. Bogatin and Ms. Gunkova's proposal.

6

32.     On or about March 6, 2020, Mr. Bogatin and Ms. Gunkova on behalf of BNG submitted an offer to purchase the Building.  A copy of the Contract of Sale dated March 6, 2020 (produced by Ms. Gunkova as GUNKOVA_000098 through 000115) is attached hereto as **Exhibit 2.**  Mr. Bogatin and Ms. Gunkova contacted Mr. Harris, who had since left REIL Capital and joined Stryker Services LLC of Boynton Beach, Florida (the "**Broker**"), to serve as BNG's broker in the purchase.  Mr. Bogatin and Ms. Gunkova handled all communications with the Broker.

33.     In or around early March 2020, Mr. Kamin travelled to Virginia for approximately one week per the parties' prior discussions.  Mr. Bogatin picked up Mr. Kamin from the airport and introduced him to Ms. Gunkova.  During his visit, Mr. Kamin explored the Building and attempted to speak with Ms. Gunkova about the business.  Mr. Kamin was informed that he was to direct all communications to Mr. Bogatin on behalf of Ms. Gunkova.

34.      During Mr. Kamin's visit, Ms. Gunkova and Mr. Kamin agreed to add Mr. Kamin as a 50% Class A Member and Manager of BNG in exchange for Mr. Kamin's buy-in contribution of $150,000.  Ms. Gunkova further represented and agreed that Mr. Kamin would have full access to the Company's bank accounts and that no decisions or actions could be taken for the Company without Mr. Kamin's approval.  As a result of Ms. Gunkova's promises, Mr. Kamin agreed and issued and endorsed two initial checks, each in the amount of $25,000.00 on March 8, 2020 for the purchase of his membership interest in BNG.  Copies of Mr. Kamin's March 8, 2020 checks (with confidential account information redacted) are attached hereto as **Exhibit 3.**

35.     Mr. Bogatin also represented to Mr. Kamin that additional monies were needed by BNG for the purchase of the Building.  Accordingly, Mr. Kamin agreed to loan funds to BNG in furtherance of the purchase.  Mr. Kamin issued and endorsed two additional checks, each in the amount of $65,000.00 on March 10, 2020 to cover the remaining $100,000 of his buy-in

contribution and a $30,000.00 loan by Mr. Kamin to BNG.  Copies of Mr. Kamin's March 10, 2020 checks (with confidential account information redacted) are attached hereto as **Exhibit 4.**

36.     In April 2020, Mr. Bogatin, on behalf of Ms. Gunkova, again represented to Mr. Kamin that additional monies were needed for BNG's purchase of the Building, and again, Mr. Kamin agreed to loan money to BNG in furtherance of the purchase of the Building.  On April 15, 2020, Mr. Kamin loaned an additional $270,000.00 to BNG.  Copies of Mr. Kamin's April 2020 checks (with confidential account information redacted) are attached hereto as **Exhibit 5.**

37.     On or about May 14, 2020, Mr. Kamin again travelled to Virginia. During Mr. Kamin's second visit, Mr. Bogatin, on behalf of Ms. Gunkova, provided Mr. Kamin with a document represented by Ms. Gunkova and Mr. Bogatin to be the Operating Agreement of BNG (the "**Operating Agreement**").[2]  The Operating Agreement was presented to and signed by Mr. Kamin which memorialized the terms agreed to by Mr. Kamin and Ms. Gunkova, including (i) Mr. Kamin and Ms. Gunkova each are a 50% Class A Member and Manager of the Company with an initial buy-in contribution of $150,000.00 each; (ii) Ms. Gunkova is prohibited from taking unilateral action for the Company without the approval of Mr. Kamin; and (iii) Mr. Kamin has full access and control of the Company's finances and bank accounts.  Mr. Kamin signed the Operating Agreement while at the Building but was not given the original signed Operating Agreement or a copy thereof at that time.  Mr. Bogatin represented to Mr. Kamin that Ms. Gunkova also signed

---

[2] The document recalled by Mr. Kamin looked similar to a document now known to be fabricated by Ms. Gunkova and Mr. Bogatin titled "Limited Liability Company Operating Agreement of BNG Group, LLC", a copy of which is attached hereto as **Exhibit 6.**  As set forth below, Mr. Kamin originally believed the document attached as Exhibit 6 to be the true and accurate Operating Agreement signed by Mr. Kamin and Ms. Gunkova because the document was provided to him and represented to be such document by Mr. Bogatin and Ms. Gunkova in November 2020.  Only after this litigation was filed did Mr. Kamin learn through a forensic analysis of the document by an expert handwriting and document examiner that Exhibit 6 was an altered document that lifted Mr. Kamin and Ms. Gunkova's signatures from another document signed by Mr. Kamin and Ms. Gunkova on October 30, 2020.

the same Operating Agreement.  Mr. Kamin relied upon the statements of Ms. Gunkova and Mr. Bogatin, not knowing them to be false, and entered into the parties' agreements based on Ms. Gunkova's representations.

38.     As a result of Mr. Kamin's financial backing and personal financial status, BNG eventually obtained financing for the Building loan through Atlantic Union Bank.  Ms. Gunkova and Mr. Bogatin compiled all necessary documentation, including documentation from Mr. Kamin, and coordinated with Atlantic Union Bank to obtain the loan.

39.     Throughout May, June, July, August, September, and October of 2020, Mr. Bogatin continued to represent to Mr. Kamin that additional monies were needed for the purchase.  Mr. Kamin continued to provide monies to BNG as a loan to the Company based on Mr. Bogatin's representations.  Mr. Kamin ultimately loaned more than two million dollars to BNG to accomplish the purchase of the Building.

40.     After becoming a Member in March 2020, Mr. Kamin requested information about the Company on a weekly basis.  Ms. Gunkova and Mr. Bogatin failed to fulfill Mr. Kamin's requests and refused to provide Mr. Kamin with information about the Company's business and records.  Mr. Bogatin continued to represent that all information would be turned over once the Building was purchased.  As Mr. Kamin had already invested millions of dollars in the Company and its purchase of the Building, and based on Ms. Gunkova and Mr. Bogatin's representations that Mr. Kamin was a 50% Class A Member and Co-Manager, Mr. Kamin proceeded to closing on the purchase – fearful that pulling out of the deal at that time would jeopardize the purchase and BNG's goal.

41.     On October 30, 2020, BNG, through Mr. Kamin and Ms. Gunkova, closed on the purchase of the Building.  BNG purchased the Building for $9,500,000, including the down payment provided by Mr. Kamin and what was to be included as the loan to the Company.

9

Notably, the closing documents submitted and signed by Mr. Kamin and Ms. Gunkova list Mr. Kamin as both a 50% Member and Manager of BNG.  Copies of the relevant closing documents, which corroborate Mr. Kamin's 50% membership interest in BNG and his status as BNG Manager, are attached collectively as **Exhibit 7.**

42.     Unbeknownst to Mr. Kamin at the time of his agreement to join the Company, Ms. Gunkova never intended to fulfill the promises she made or that she and Mr. Bogatin represented to Mr. Kamin regarding his membership interest, his authority on behalf of the Company, and his access to financial accounts and Company information.  Ms. Gunkova and Mr. Bogatin simply made the representations to Mr. Kamin to induce Mr. Kamin into providing the finances Ms. Gunkova needed to purchase the Building and also to obtain Mr. Kamin's personal and financial information.

43.     Immediately after the purchase settlement of the Building, Mr. Bogatin contacted Mr. Kamin on November 3, 2020 regarding a potential purchase of a residential house and land lot in Palm Beach County, Florida (the "**Florida Deal**").

44.     Again, without knowledge of the true intents and actions of Ms. Gunkova and Mr. Bogatin, Mr. Kamin agreed to consider the Florida Deal.

45.     On or around November 10, 2020, Mr. Bogatin and Ms. Gunkova traveled to the Palm Beach area and invited Mr. Kamin to stay with them for a few days.  Mr. Bogatin picked Mr. Kamin up on November 11, 2020, and brought him to the vacation rental leased by Mr. Bogatin and Ms. Gunkova.  Over the course of four days, Mr. Bogatin and Ms. Gunkova persuaded Mr. Kamin to proceed with the Florida Deal, including a representation to Mr. Kamin that Mr. Bogatin had a client who had agreed to subsequently purchase the Florida Deal property from them for a substantial profit.  Mr. Kamin, still not fully informed as to Mr. Bogatin and Ms. Gunkova's true actions, agreed on the condition that Mr. Bogatin would obtain financing.

CORE/3529060.0002/185282874.1

46.    On or about November 15, 2020, Mr. Bogatin and Ms. Gunkova took Mr. Kamin to the office of real estate agent Jim Wrona, where Mr. Kamin and Ms. Gunkova signed a Residential Contract for Sale and Purchase (the "**Florida Contract**").

47.    On November 17, 2020, Mr. Kamin submitted a payment in the amount of $100,000.00 on behalf of BNG as the initial deposit for the Florida Deal.

48.    On November 20, 2020, Mr. Bogatin arrived at Mr. Kamin's residence, crying that he had financial problems and could not pay the additional deposits necessary for the Florida Deal. Mr. Bogatin represented to Mr. Kamin that if Mr. Kamin did not provide the additional $300,000.00 required under the Florida Deal's Residential Purchase Contract, BNG would be in breach of the Florida Contract and that Mr. Kamin would lose his initial $100,000.00 deposit. Accordingly, Mr. Kamin submitted a second deposit in the amount of $300,000.00 on behalf of BNG.  Mr. Bogatin agreed to and did sign a Promissory Note with Mr. Kamin, agreeing to repay Mr. Kamin for the amounts loaned by Mr. Kamin for the Florida Deal.

49.    On November 23, 2020, Mr. Bogatin again contacted Mr. Kamin with further complaints that Mr. Bogatin would not provide the remaining deposits needed for the Florida Deal. Mr. Kamin provided two additional deposits in the amount of $40,000.00 and $60,000.00 out of fear that his prior deposits would be lost forever if Mr. Kamin did not continue paying.  In total, Mr. Kamin paid $500,000.00 in furtherance of the Florida Deal based on the misrepresentations of Mr. Bogatin that Mr. Bogatin would obtain successful financing for the deal when Mr. Bogatin had no intent or ability to do so.

50.    Mr. Bogatin notified Mr. Kamin that Mr. Bogatin was not able to obtain financing as he had promised.   Mr. Kamin became concerned and suspicious of the representations previously made by Mr. Bogatin and Mr. Kamin.  The Florida Deal did not close, and Mr. Kamin hired an attorney to recover his deposits.  Ultimately, Mr. Kamin was refunded $442,500.00 of his

CORE/3529060.0002/185282874.1

$500,000.00.  To date, Mr. Kamin has not received the remaining $57,500.00 he paid for the Florida Deal as a result of Mr. Bogatin and Ms. Gunkova's fraudulent representations and inducement of Mr. Kamin into the Florida Deal.

51.     Beginning in December 2020, Mr. Kamin discovered that Ms. Gunkova was violating the terms of the parties' BNG agreement, including but not limited to:

     i.   Ms. Gunkova unilaterally hired employees for BNG without the knowledge or consent of Mr. Kamin;

    ii.   Ms. Gunkova unilaterally entered into lease contracts with third-party tenants of the Building without the knowledge or consent of Mr. Kamin.

52.     On or about December 20, 2020, Mr. Kamin then learned of Mr. Bogatin's indictment of the no less than forty-five (45) felony charges previously mentioned above and set forth in Exhibit 1.

53.     After repeatedly being shut out of Company business and after learning of Mr. Bogatin's pending felony fraud charges, Mr. Kamin became increasingly concerned with his investment in BNG.  Mr. Kamin demanded that Ms. Gunkova and Mr. Bogatin send him the Operating Agreement signed by Mr. Kamin and Ms. Gunkova and other relevant Company documents.

54.     Eventually, on or around January 2, 2021, Mr. Bogatin and Ms. Gunkova shipped a box to Mr. Kamin containing three binders of documents.  The box contained the operating agreement attached hereto as Exhibit 6 and was represented by Mr. Bogatin and Ms. Gunkova to Mr. Kamin to be the Operating Agreement signed by Mr. Kamin on in May 2020.  Mr. Kamin confirmed that the terms included in the operating agreement believed by Mr. Kamin to be a true and accurate copy signed by him and delivered to him by Mr. Bogatin and Ms. Gunkova were consistent with the terms agreed upon by Mr. Kamin and Ms. Gunkova, including:

CORE/3529060.0002/185282874.1

i. the "Company shall be managed by a Board of Managers". Section 5.1.3. The Board of Managers consisting of two (2) Class A Members (for which Mr. Kamin and Ms. Gunkova are the only Class A Members) shall be elected and be responsible for performing the major functions of the company. *Id.; see also* Section 5.1.3.3. Any action taken on behalf of the Company must be approved by both Class A Members, specifically,

> The Board of Managers shall have full, exclusive and complete discretion, power, and authority…to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:…sell, convey, assign, mortgage or lease any real estate and any personal property…Sell, dispose, trade or exchange Company assets…Enter into agreements and contracts…Execute or modify leases with respect to any part or all of the assets of the Company" *see* p. 15, Section 5.1.4 and 5.1.4.2;

ii. "the Board of Managers shall not undertake any of the following without the approval of at least fifty-one percent (51%) of the Interests of the Members", including but not limited to any sale, lease or other disposition of the Company assets. Section 5.1.5;

iii. "Except as otherwise provided in this Agreement, wherever the Law or this Agreement requires unanimous consent by the Board of Managers to approve or take any action, that consent shall be given in writing and, in all cases, shall mean the consent of all Managers." Section 5.2.6;

iv. the "Board of Managers shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business." Section 8.2.1; and

CORE/3529060.0002/185282874.1

     v.    each Member has a right to inspect the books and records of the Company at any time.  Section 8.2.2.

55.    Throughout January and February 2021, Mr. Kamin requested Mr. Bogatin and Ms. Gunkova provide him information related to BNG's bank accounts.  Ms. Gunkova and Mr. Bogatin refused.  Mr. Kamin attempted to receive the information directly from the financial institutions but was told repeatedly by such institutions that the accounts only authorized Ms. Gunkova to request and receive such information.

56.    Mr. Kamin requested he be added as an authorized signatory to BNG's operating account at TD Bank.  Ms. Gunkova again refused.  Ms. Gunkova instead offered to open a *new* account and add Mr. Kamin as an authorized holder on the account.  Ms. Gunkova continued to conceal BNG's financial accounts and the activity that took place using those accounts from Mr. Kamin.

57.    Mr. Kamin then learned that, unbeknownst to Mr. Kamin, Ms. Gunkova signed an agreement with a real estate broker to begin listing the Building for marketing and sale in or around January 2021.  Ms. Gunkova did not confer with Mr. Kamin prior to taking actions to list the Building for sale, nor did she obtain his consent to take such action.

58.    On February 10, 2021, Mr. Kamin, by counsel, sent Ms. Gunkova a letter objecting to the sale of the Building and demanding certain information about the business of BNG (the "**Derivative Demand Letter**").  A copy of the Derivative Demand Letter is attached hereto as **Exhibit 8** and incorporated by reference as if fully set forth herein.

59.    Since receiving the Derivative Demand Letter, Ms. Gunkova has insisted that Mr. Kamin is not a 50% Class A Member and/or Manager of BNG.  Contrary to the Company's Operating Agreement (including the version provided to Mr. Kamin by Ms. Gunkova and Mr. Bogatin in January 2021), and documents submitted by Ms. Gunkova and Mr. Kamin to the banks

CORE/3529060.0002/185282874.1

on October 30, 2020, Ms. Gunkova then asserted that Mr. Kamin is only a 20% Class A Member, is not co-Manager, and is not entitled to any Company information or management.  To date, Ms. Gunkova continues to assert that she is sole Manager of BNG.[3]

60.     On March 8, 2021, Mr. Kamin filed suit against Ms. Gunkova in the Loudoun County Circuit Court throughout which Ms. Gunkova failed to comply with Court Orders compelling discovery.  As a result, Mr. Kamin was forced to issue numerous third-party Subpoenas to obtain key information about BNG – the Company that he was supposed to be 50% Class A Member and Co-Manager.

61.     In October 2022, the Loudoun County Court recognized Ms. Gunkova's persistent discovery violations and ordered a full turnover of all electronic devices used by Ms. Gunkova and Mr. Bogatin for forensic analysis (the "**Computer Forensic Order**").  Ultimately, thirty-four (34) devices were analyzed, resulting in hundreds of thousands of results and evidence of intentional spoliation of evidence after the Computer Forensic Order was entered (the "**Computer Forensic Results**").

62.     Since filing his Complaint, Mr. Kamin has discovered, and continues to discover, that without Mr. Kamin's knowledge or consent, Ms. Gunkova and Mr. Bogatin conspired and worked together beginning in 2019 and continuing to date to defraud and willfully injure Mr. Kamin and BNG by engaging in forgery, fraud, and self-dealing.

---

[3] In September 2023, Mr. Kamin filed a Motion with the Bankruptcy Court asking to remove Ms. Gunkova from management of BNG to preserve and protect BNG during the pendency of her personal bankruptcy case.  On October 23, 2023, Mr. Kamin and Ms. Gunkova agreed to appoint a Chief Restructuring Officer to have full control of the management and operations of BNG.  A hearing on the application to employ Chief Restructuring Officer is scheduled for November 7, 2023.

CORE/3529060.0002/185282874.1

## The Forgeries

63.    In support of her position that Ms. Gunkova is 80% Class A Member, Ms. Gunkova produced numerous alleged governance documents of BNG unilaterally entered into by Ms. Gunkova without Mr. Kamin's knowledge and/or approval.   Ms. Gunkova contended the documents were true and authentic, including the purported signatures of Mr. Kamin.

64.    To accomplish their forgery and falsification of BNG governance documents, Ms. Gunkova and Mr. Bogatin worked together to forge Mr. Kamin's signature on documents and/or electronically sign documents on Mr. Kamin's behalf without his knowledge or consent.

65.    To legitimize their purported amendments, Mr. Bogatin and Ms. Gunkova enlisted the help of notary public Kirk David Hilliard ("**Notary Hilliard**") of Capitol Mobile Notary, Virginia Registration No. 7839539, who Ms. Gunkova and Mr. Bogatin have repeatedly used for services to perpetuate their fraud and conspiracy that documents are in fact signed and notarized as they appear.   Bank records evidence that Ms. Gunkova and Mr. Bogatin have paid Notary Hilliard thousands of dollars for his participation in the fraud.

66.    The forgeries committed by Ms. Gunkova and Mr. Bogatin with regards to BNG governance documents include but are not limited to:

   i.   **Exhibit 9: AUB 2003-2035:** An Operating Agreement of BNG allegedly signed and initialed by Mr. Kamin on September 20, 2019 (This document was received by Mr. Kamin in response to a Subpoena to Atlantic Union Bank.  The same document was also submitted by Ms. Gunkova to another financial institution, Bank Five Nine, in 2022);

   ii.   **Exhibit 10: AUB 3214-3247**: An Operating Agreement of BNG allegedly signed and initialed by Mr. Kamin in February 2020.  (This document was received by Mr. Kamin in response to a Subpoena to Atlantic Union Bank. On September 30, 2021,

CORE/3529060.0002/185282874.1

Ms. Gunkova admitted in her deposition under oath that the document was created by Mr. Bogatin in October 2020 and that Mr. Bogatin signed Mr. Kamin's name. Ms. Gunkova admitted that the forged document was submitted to Atlantic Union Bank and that Ms. Gunkova did not tell Atlantic Union Bank that the document was forged by Mr. Bogatin.  In October 2021, counsel for Ms. Gunkova and Mr. Bogatin stipulated that Mr. Bogatin had signed Mr. Kamin's signature to the document.  The document was also found on Ms. Gunkova's and Mr. Bogatin's computer and in their email accounts as a result of the Computer Forensic Order);

iii.   **Exhibit 6**: An Operating Agreement of BNG allegedly signed and initialed by Mr. Kamin in March 2020 and produced to Mr. Kamin by Ms. Gunkova and Mr. Bogatin in January 2021 as the true and authentic version signed by the parties.  (Given that the document mirrored what Mr. Kamin recalled signing, Mr. Kamin believed this version to be authentic until he learned in the Loudoun County litigation that the signatures appearing on the document were in fact lifted from one of the closing documents);

iv.   **Exhibit 11: FREEDMAN 003-005**: A document titled "First Amendment to the Operating Agreement of BNG Group LLC" dated March 14, 2020, and allegedly signed and initialed by Mr. Kamin.  The document also bears the alleged signature and initials of Dr. Bruce Freedman, which Mr. Bogatin admitted that he forged in an email obtained in the Computer Forensic Results;

v.   **Exhibit 12**: A document entitled "Membership Interest Transfer Agreement dated May 16, 2020 and allegedly signed by Mr. Kamin;

vi.   **Exhibit 13**: A document entitled "October 29, 2020 Members Meeting BNG Group LLC" dated October 29, 2020 and allegedly signed by Mr. Kamin;

CORE/3529060.0002/185282874.1

vii.    **Exhibit 14**: A document entitled "Amended and Restated Operating Agreement of BNG Group LLC" dated October 29, 2020 and allegedly signed by Mr. Kamin and notarized by Notary Hilliard;

viii.    **Exhibit 15**: A document entitled "Second Amendment to Operating Agreement of BNG Group LLC" dated October 29, 2020 and allegedly signed by Mr. Kamin and notarized by Notary Hilliard; and

ix.    **Exhibit 16:** A document entitled "Power of Representation" that was produced by Ms. Gunkova in support of her position that Mr. Bogatin was Mr. Kamin's agent. The document was allegedly signed by Mr. Kamin and notarized by notary public Fatima El-Hage.

67.    The documents were not in fact signed by Mr. Kamin, and Mr. Kamin hired forensic expert Kristen Welch to analyze the documents.  A copy of Ms. Welch's expert report is attached hereto as **Exhibit 17**.  Based on Ms. Welch's analysis and opinions, it was confirmed that Mr. Bogatin and Ms. Gunkova engaged in regular practices of forging signatures, including signatures of Mr. Kamin and third-party notary publics, by either signing the name of the alleged signatory or by lifting and copying authentic signatures from a source document to a new document, resulting in a forged signature.

68.    Mr. Kamin also learned through third-party discovery in the Loudoun County litigation that the forgeries of documents were not limited to internal governance documents of BNG.  Mr. Kamin learned that Mr. Bogatin and Ms. Gunkova, armed with Mr. Kamin's personal identifiers and financial records as a result of the loan process for the purchase of the Building, continued their scheme throughout 2020, 2021, 2022, and 2023 by purporting to be Mr. Kamin to various entities and individuals including but not limited to the Small Business Administration,

Atlantic Union Bank, TD Bank, EagleBank, Ascentium Capital, US Business Funding, Financial

Partners Group, and Bank Five Nine.

69.    Mr. Bogatin and Ms. Gunkova worked together to create numerous email

addresses as early as March 2020 purporting to belong to Mr. Kamin, including

harry@ariamedispa.com; harry@bnggroupllc.com; and grishak301@gmail.com.  Mr. Bogatin and

Ms. Gunkova utilized the email addresses to exchange thousands of pages worth of emails to the

SBA, financial institutions, and the Broker with a signature block affixed to the emails to give the

appearance that Mr. Kamin was the sender.  Ms. Gunkova knew that Mr. Bogatin created and used

the email addresses to portray emails as coming from Mr. Kamin and never notified the Broker,

Atlantic Union Bank, or any others involved in the process that the emails were not in fact coming

from Mr. Kamin but were instead coming from Mr. Bogatin.[4]

70.    Mr. Bogatin and Ms. Gunkova also worked together to defraud Mr. Kamin and

numerous financial institutions by submitting false information and forged documents appearing

to be signed and/or submitted by Mr. Kamin.

71.    Ms. Gunkova and Mr. Bogatin's forgeries and fraud submitted to financial

institutions include but are not limited to the following:

ix.    **Exhibit 18: STRYKER 337-340:** An alleged "Term Sheet" allegedly signed by

Mr. Kamin.  (This document was received by Mr. Kamin in response to Subpoenas

to the Broker and Atlantic Union Bank.  In October 2021, counsel for Ms. Gunkova

---

[4] Mr. Kamin did not learn of the fraudulent communications using these email addresses until the emails
were compelled by the Loudoun Court to be produced by Ms. Gunkova in the litigation after she originally
refused to produce them.  Mr. Kamin was not (and still has not been) provided with the account login and/or
password information, although he has requested such information.  Accordingly, Mr. Kamin did not and
still does not have access to the account(s) and is unable to determine what, if any, emails are being sent by
the account purportedly on his behalf or received by the account purportedly on his behalf.

and Mr. Bogatin stipulated that Mr. Bogatin had signed Mr. Kamin's signature to the document.);

x.   **Exhibit 19:  GUNKOVA 40520-40524:** A Personal Financial Statement allegedly signed by Harry Kamin as a 20% Member of BNG and dated May 15, 2020 that was submitted by Ms. Gunkova to the Broker;

xi.   **Exhibit 20: AUB 455-459**: A Personal Financial Statement allegedly signed by Harry Kamin and dated May 17, 2020 that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank;

xii.   **Exhibit 21: AUB 849**: A Personal Financial Statement allegedly signed by Harry Kamin and dated May 20, 2020 that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank;

xiii.   **Exhibit 22: AUB 859-861**: A Personal Financial Statement allegedly signed by Harry Kamin and dated May 19, 2020 that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank in support of a loan for ARIA;

xiv.   **Exhibit 23: AUB 867-868**: An SBA Borrower Information Form allegedly signed by Mr. Kamin on May 20, 2020 was submitted by Ms. Gunkova and/or Mr. Bogatin to Atlantic Union Bank in support of a loan for ARIA;

xv.   **Exhibit 24: AUB 870-873**: An SBA Borrower Information Form allegedly signed by Mr. Kamin as "20%" owner and "Director" of Skin Logic and dated May 20, 2020 that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank for a loan application by ARIA in the amount of $4.4 million.  (This document was also found on Ms. Gunkova and Mr. Bogatin's computers as a result of the Computer Forensic Order);

xvi.    **Exhibit 25:** A document entitled "Amendment No. 1 to Contract of Sale" alleged signed by Mr. Kamin.  (In October 2021, counsel for Ms. Gunkova and Mr. Bogatin stipulated that Mr. Bogatin had signed Mr. Kamin's signature to the document.);

xvii.    **Exhibit 26:** A document entitled "Amendment No. 2 to Contract of Sale" alleged signed by Mr. Kamin.  (In October 2021, counsel for Ms. Gunkova and Mr. Bogatin stipulated that Mr. Bogatin had signed Mr. Kamin's signature to the document.);

xviii.    **Exhibit 27:** A document entitled "Amendment No. 3 to Contract of Sale" alleged signed by Mr. Kamin.  (In October 2021, counsel for Ms. Gunkova and Mr. Bogatin stipulated that Mr. Bogatin had signed Mr. Kamin's signature to the document.);

xix.    **Exhibit 28: AUB 869**: A General Authorization Form allegedly signed by Mr. Kamin and dated May 20, 2021was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank in support of a loan for ARIA while the parties were actively engaged in litigation in Loudoun County;

xx.    **Exhibit 29: AUB 3133-34**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank;

xxi.    **Exhibit 30: AUB 3135-3136:** A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank.  (The tenant's signature on AUB 3136 also appears to have been forged and lifted from a signature appearing on document **AUB 4292**);

xxii.    **Exhibit 31: AUB 3137-3138**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank.

xxiii.    **Exhibit 32: AUB 3139-3140**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank.  (The

21

tenant's signature on AUB 3140 also appears to have been forged and lifted from a signature appearing on document **AUB 7331**);

xxiv.    **Exhibit 33: AUB 3141-3142**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank. (The tenant's signature on AUB 3142 also appears to have been forged and lifted from a signature appearing on document **AUB 4325**);

xxv.    **Exhibit 34: AUB 3143-3144**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank. (The tenant's signature on behalf of "Northern Yirginia [*sic*] Dental Clinic" affixed to AUB 3144 also appears to have been forged and lifted from the Landlord's signature on behalf of Judicial Drive Property Holding, LLC affixed to document **AUB 4297**);

xxvi.    **Exhibit 35: AUB 3145-3146**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank.

xxvii.    **Exhibit 36: AUB 3147-3148**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank.

xxviii.    **Exhibit 37: AUB 3149-3150**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank. (The tenant's signature on AUB 3150 also appears to have been forged and lifted from a signature appearing on document **AUB 4322);**

xxix.    **Exhibit 38: AUB 3151-3152**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank.

xxx.    **Exhibit 39: AUB 3153-3154**: A Lease Amendment allegedly signed by Mr. Kamin that was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank.

CORE/3529060.0002/185282874.1

xxxi.   **Exhibit 40: STRYKER 631:** A document entitled "Uniform Residential Loan Application" allegedly signed twice by Mr. Kamin.

xxxii.   **Exhibit 41: GUNKOVA 55743-46:** A document entitled "Vacant Land Disclosure" alleged signed and initialed by Mr. Kamin on November 16, 2020.

xxxiii.   **Exhibit 42:  GUNKOVA 55757:** A document entitled "Addendum to Contract" allegedly signed and initialed by Mr. Kamin on November 17, 2020.

xxxiv.   **Exhibit 43: GUNKOVA 55799-803:** A document entitled "Seller's Property Disclosure" alleged signed and initialed by Mr. Kamin on November 19, 2020.

xxxv.   **Exhibit 44:** A document entitled "Financing Form" allegedly signed by Mr. Kamin on November 24, 2020 as 65% member of BNG.

xxxvi.   **Exhibit 45:** A document entitled "Consulting, Success Fee and Non-Circumvention/Non-Disclosure Agreement" allegedly signed by Mr. Kamin as "Director" of BNG on November 24, 2020.

xxxvii.   **Exhibit 46: GUNKOVA 38696:** A document entitled "General Authorization Form" allegedly signed by Mr. Kamin on June 8, 2020 as a member of both BNG and ARIA.

xxxviii.   **Exhibit 47: AUB 2214-2247:** A document entitled "Limited Liability Company Operating Agreement of Skin Logic LLC [ARIA]" allegedly signed by Mr. Kamin as 50% member of ARIA and dated April 10, 2010.  The document was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank in support of a loan request by ARIA.  (In addition to being received in response to a Subpoena to Atlantic Union Bank, the document was also found on Ms. Gunkova and Mr. Bogatin's computers as a result of the Computer Forensic Order.)

CORE/3529060.0002/185282874.1

xxxix.    **Exhibit 48: AUB 12352-12385:** A document entitled "Limited Liability Company Operating Agreement of Skin Logic LLC [ARIA]" allegedly signed by Mr. Kamin as 50% member of ARIA and dated April 10, 2020. The document was submitted by Ms. Gunkova and Mr. Bogatin to Atlantic Union Bank, EagleBank, Bank Five Nine in support of loan requests by ARIA. (In addition to being received in response to a Subpoenas to the aforementioned banks, numerous files of the document were also found on Ms. Gunkova and Mr. Bogatin's computers as a result of the Computer Forensic Order.)

xl.    **Exhibit 49:** A document entitled "Limited Liability Company Operating Agreement of Skin Logic LLC [ARIA]" allegedly signed by Mr. Kamin as 70% member of ARIA. (The document and an email transmitting the document were also found on Ms. Gunkova and Mr. Bogatin's computers as a result of the Computer Forensic Order.)

xli.    **Exhibit 50:** A Finance Application allegedly signed by Mr. Kamin in December 2020 as a 70% member of ARIA and submitted to Ascentium Capital in support of a loan request for ARIA.

xlii.    **Exhibit 51:** A document entitled "Limited Liability Company Resolution of Skin Logic, LLC" allegedly signed by Mr. Kamin in February 2021 as a member of ARIA.

xliii.    **Exhibit 52: EAGLEBANK 527-528:** A document entitled "Limited Liability Company Resolution of Skin Logic, LLC [ARIA]" allegedly signed twice by Mr. Kamin as a member of ARIA and dated February 1, 2021.

xliv.    **Exhibit 53:** A document entitled "Resolutions of Members of Skin Logic LLC" allegedly signed by Mr. Kamin on April 11, 2020 as a member of ARIA.

CORE/3529060.0002/185282874.1

xlv.   **Exhibit 54:** A document entitled "Resolutions of Members of Skin Logic LLC" allegedly signed by Mr. Kamin on April 11, 2020 as a member of ARIA.

xlvi.   **Exhibit 55:** A document entitled "Resolutions of Members of Skin Logic LLC" allegedly signed by Mr. Kamin on April 11, 2020 as a member of ARIA.

xlvii.   **Exhibit 56: EAGLEBANK 640-643:** A document entitled "Membership Interest Transfer Agreement" allegedly signed by Mr. Kamin as a member of ARIA on April 10, 2020.

xlviii.   **Exhibit 57:** A Personal Financial Statement allegedly signed by Mr. Kamin on January 7, 2021 as a 50% member of ARIA (the native excel spreadsheet was located on Ms. Gunkova and Mr. Bogatin's computer as a result of the Computer Forensic Order).

xlix.   **Exhibit 58: EAGLEBANK 488-491:** A document entitled "Guaranty" allegedly signed by Mr. Kamin as a member of ARIA on February 1, 2021 (just days before the Derivative Demand Letter was issued) and allegedly notarized by Notary Hilliard.

l.   **Exhibit 59: EAGLEBANK 741-742:** A document entitled "Meeting of the Members Skin Logic LLC [ARIA]" allegedly signed by Mr. Kamin as a member of ARIA on April 30, 2021 (while the Loudoun County litigation was pending).

li.   **Exhibit 60: FOIA 226:** A Tax Form 4506-T allegedly signed by Mr. Kamin on behalf of SNB Billing & Services Inc. on August 16, 2020.

72.   Ms. Gunkova and Mr. Bogatin also fraudulently electronically signed ("**e-signed**") documents on behalf of Mr. Kamin without his knowledge or consent through the use of their fraudulent email addresses harry@ariamedispa.com and grishak301@gmail.com, including but not limited to:

li.     **Exhibit 61: FOIA 93-112:** An SBA Loan Authorization and Agreement allegedly e-signed by Mr. Kamin on behalf of Sterling Investment on June 20, 2020 from IP address 71.126.149.50 using the email address harry@ariamedispa.com;

lii.    **Exhibit 62: FOIA 229-248:** An SBA Loan Authorization and Agreement allegedly e-signed by Mr. Kamin on behalf of SNB Billing & Services Inc. on June 25, 2020 from IP address 71.126.149.50 using the email address grishak301@gmail.com;

liii.   **Exhibit 63: FOIA: 20-39:** An SBA Loan Authorization and Agreement allegedly e-signed by Mr. Kamin on June 26, 2020 from IP address 71.126.149.50 using the email address grishak301@gmail.com;

liv.    **Exhibit 64: FOIA 353-372:** An SBA Loan Authorization and Agreement allegedly e-signed by Mr. Kamin on behalf of MNAP Medical Solutions Inc. on August 28, 2020 from IP address 71.126.149.50 using the email address grishak301@gmail.com;

lv.     **Exhibit 65: STRYKER 4258-4261:** A "Consulting, Success Fee and Non-Circumvention/Non-Disclosure Agreement" with the Broker allegedly e-signed by Mr. Kamin on November 9, 2020 from IP address 71.126.149.50 using the email address harry@ariamedispa.com.  (The document was obtained in response to a Subpoena to the Broker and purports to make Mr. Kamin personally liable for fees allegedly owed by BNG to the Broker related to the purchase of the Building. Interestingly, there is no similar agreement making Ms. Gunkova personally liable);

lvi.    **Exhibit 66:** An "Account Verification Form" allegedly e-signed by Mr. Kamin as 100% member of ARIA on November 12, 2020 from IP address 71.126.149.50 using the email address grishak301@gmail.com.  (This document was obtained from the Computer Forensic Results); and

26

lvii.    **Exhibit 67:** A Small Business Loan Application allegedly e-signed by Mr. Kamin as 50% owner of Skin Logic on December 22, 2020. (This document was obtained from the Computer Forensic Results).

73.    Knowing that Mr. Kamin did not in fact e-sign the documents referred to above, Mr. Kamin hired computer forensic expert J. Christopher Racich, who had performed the analysis on the 34 Devices pursuant to the Computer Forensic Order, to determine where the documents were allegedly e-signed. Using and comparing metadata from the Computer Forensic Results, Mr. Racich determined that the IP address 71.126.149.50 used to e-sign Mr. Kamin's signature was associated with Ms. Gunkova and ARIA. A copy of Mr. Racich's report is attached hereto as **Exhibit 68**.

74.    Mr. Bogatin and Ms. Gunkova used Mr. Kamin's identity and financial records to apply for and obtain financial loans– all without Mr. Kamin's knowledge or consent. To date, the total amounts received by Ms. Gunkova, ARIA, and Mr. Bogatin as a result of Ms. Gunkova and Mr. Bogatin's conspiracy and submissions of false information to the Small Business Administration and numerous financial institutions is believed to be more than $2.5 million.

75.    Ms. Gunkova received funds obtained as a result of the fraudulent loan scheme, and transferred those funds to Ms. Gunkova, Mr. Bogatin, ARIA, VNJ, and Sterling Investment.

76.    Ms. Gunkova used funds converted from BNG as well as monies received from their fraudulent loan scheme to pay hundreds of thousands of dollars in legal fees to Ms. Gunkova's personal attorneys, one of which was disqualified by the Loudoun County Circuit Court in June 2023 as a result of Ms. Gunkova's apparent fraud.

77.    As a result of the fraud perpetuated upon the financial institutions by Ms. Gunkova, Mr. Kamin has been damaged by way of apparent personal liability of loans obtained by Ms. Gunkova through the theft of his identity.

CORE/3529060.0002/185282874.1

**Fraudulent Transfers**

78.     In addition, Ms. Gunkova wrongfully exercised dominion and control over BNG's funds and assets by directing BNG funds to be transferred to herself, ARIA, Mr. Bogatin, VNJ, and Sterling Investment without Mr. Kamin's knowledge or consent.

79.     Ms. Gunkova directed BNG funds to be wrongfully transferred as follows:

- no less than $954,394.00 to ARIA;

- no less than $312,658.00 to Ms. Gunkova personally;

- no less than $5,000.00 to Mr. Bogatin;

- no less than $25,000.00 to VNJ; and

- no less than $60,000.00 to Sterling Investment.

80.     Ms. Gunkova also utilized BNG funds and credit cards to pay the personal expenses of herself and Mr. Bogatin, as well as expenses of ARIA.  Such expenses included personal vacations, personal car payments, cell phone payments, Mr. Bogatin's cosmetic dentistry bills, personal litigation expenses and attorneys, and personal shopping expenditures.

81.     Ms. Gunkova was in control of and operated each ARIA, VNJ, and Sterling Investment at the time the money was wrongfully converted from BNG.  As a result, ARIA, VNJ, and Sterling Investment were each aware that the money rightfully belonged to BNG and received the funds anyway.

82.     After Mr. Kamin filed his Loudoun County litigation, Ms. Gunkova also engaged in the transfer and dissipation of her assets in violation of Virginia's fraudulent conveyance statute, codified at Va. Code § 55.1-400, *et seq.* by making fraudulent and/or improper transfers.

83.     Specifically, since February 9, 2021, Ms. Gunkova has transferred no less than $53,517.00 to Mr. Bogatin and has transferred no less than $41,805.00 to Defendant ARIA.

84.    The transfers made by Ms. Gunkova were made for inadequate or no consideration for the conveyance under the threat of litigation by Mr. Kamin and BNG.

85.    Ms. Gunkova's transfers to Mr. Bogatin and ARIA were meant to hinder, delay, and/or defraud Mr. Kamin.

86.    The transfers resulted in the insolvency of Ms. Gunkova, who is without adequate funds and/or assets to satisfy the anticipated judgment(s) of Mr. Kamin and BNG.

87.    As a result of the fraudulent conveyances made by Ms. Gunkova to Mr. Bogatin and ARIA, Mr. Kamin and BNG are damaged through the impairment of their claims each as a creditor of Ms. Gunkova and has suffered damages in the amount no less than $94,322.00.

**Self-Dealing to the Detriment of BNG and Mr. Kamin**

88.    As a Manager of BNG, Ms. Gunkova is vested with special confidence and has fiduciary duties to act in the best interests of the Company.  Ms. Gunkova, in her capacity as Manager of the Company, is required to perform her duties in compliance with the terms of the Operating Agreement and with the laws of the Commonwealth of Virginia.

89.    Instead, Ms. Gunkova engaged and continues to engage in self-dealing to benefit herself and her *other* company, ARIA, including but not limited to:

i.    converting BNG's assets, including large sums of money, to ARIA and herself without Mr. Kamin's knowledge and over his express objection to any such transfer;

ii.    fabricating a document purported to be a "Third Amendment to Office Lease Agreement" between BNG and ARIA, which included a backdated effective date of January 1, 2018, and reduced ARIA's monthly rent by $10,000 to the detriment of BNG;

CORE/3529060.0002/185282874.1

iii.   using and co-mingling BNG funds to pay ARIA expenses, including payroll expenses of ARIA and personal expenses of Ms. Gunkova and Mr. Bogatin;

iv.   filing improper and false tax records of BNG, including co-mingling assets and liabilities of BNG and ARIA and misrepresenting member information such as member contributions;

v.   failing to enforce the lease agreements of BNG and ARIA, including failing to collect full and timely monthly rent from ARIA since December 2020, to benefit herself and ARIA in an amount no less than $602,934.70 in unpaid rent;

vi.   failing to enforce in favor of BNG and against ARIA alleged loan agreements between BNG and ARIA, including collection of alleged loan payments due by ARIA to BNG under the alleged agreements;

vii.   taking distributions from BNG without similarly making a proportionate distribution to Mr. Kamin as the other 50% member of BNG and even reducing Mr. Kamin's capital account to reflect a distribution to Mr. Kamin that never happened; and

viii.   willfully and persistently disregarding Mr. Kamin's rights as 50% Member and co-Manager of BNG.

90.   Ms. Gunkova, with the assistance of Mr. Bogatin, also fabricated numerous contracts alleged by Ms. Gunkova in the Loudoun litigation to have been entered into by ARIA and BNG, including (i) an alleged "Short Term Loan Exchange Agreement" dated September 18, 2019, (ii) an alleged "Contract for Services" dated September 20, 2019, (iii) an alleged "Asset

CORE/3529060.0002/185282874.1

Contribution Agreement"[5] dated September 21, 2019, and (iv) an alleged "Loan Agreement" dated October 30, 2019.  If the alleged contracts are in fact authentic and enforceable agreements (and not just additional act of fraud by Ms. Gunkova and Mr. Bogatin), Ms. Gunkova has breached her fiduciary duties to BNG by failing to enforce the alleged agreements in favor of BNG and against ARIA.

91.     Most recently, Ms. Gunkova's breaches have resulted in a default by BNG of the Loan and Security Agreement entered into with Atlantic Union Bank.  Specifically, in late September 2023, Atlantic Union Bank notified Mr. Kamin that Ms. Gunkova had caused a default by (i) failing to pay BNG's real estate taxes owed on the Building in 2022 and 2023, and (ii) improperly withdrawing funds from an escrow reserve account required to be maintained in accordance with the Loan and Security Agreement entered into with Atlantic Union Bank.

92.     As a result of the default, the ownership of the Building has been threatened, and if the default is not cured, the Building could be foreclosed upon by Atlantic Union Bank and/or Loudoun County.  As a personal co-guarantor of the Loan and Security Agreement, Mr. Kamin may be liable for the entirety of the loan (at this point over $7 million) if called due as a result of Ms. Gunkova's misconduct.

93.     The actions of Ms. Gunkova were contrary to the terms of the parties' Operating Agreement and were willful, deliberate, and with regards to forgeries, were a knowing violation of criminal law.

94.     As a result of Ms. Gunkova's fraud, forgery, and willful harm, BNG has been damaged as follows:

---

[5] Notably, while alleging that the Asset Contribution Agreement is valid and the assets listed on page 6 of the alleged Agreement were transferred by Ms. Gunkova to BNG in September 2019, Ms. Gunkova filed bankruptcy in this Court on behalf of ARIA and listed many of the same assets as assets of ARIA in August 2023.  See Schedule A/B filed in Skin Logic LLC Bankruptcy Case No. 23-11352-KHK.

i.  in an amount no less than $2,366,342.78, plus interest at the statutory rate, and attorney's fees pursuant to Va. Code § 13.1-1045 for her breaches of her fiduciary duties to BNG;

ii.  in an amount no less than $1,357,052.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) and Va. Code § 13.1-1045 for her conversion of BNG funds; and

iii.  in an amount no less than $94,322.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to Va. Code §§ 13.1-1045 and 55.1-403 for her fraudulent and/or improper transfers in violation of Va. Code § 55.1-400, *et. seq.*

95.  As a result of Ms. Gunkova's fraud, forgery, and willful harm, Mr. Kamin has been damaged as follows:

i.  in an amount no less than $2,216,342.78, plus interest at the statutory rate, for her willful breaches of the parties' Operating Agreement;

ii.  in an amount no less than $2,273,842.78., plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) for her fraudulent inducement of Mr. Kamin;

iii.  in an amount no less than $4,773,842.78, plus prejudgment interest, treble damages totaling no less than $14,321,528.34, and attorneys' fees, and costs for her conspiracy against Mr. Kamin;

iv.  in an amount no less than $2,500,000.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect*

*Development Co. v. Bershader*, 258 Va. 75 (1999) for her fraud against Mr.

Kamin; and

v.     in an amount no less than $94,322.00, plus interest at the statutory rate, punitive

damages in the amount of $350,000, and attorney's fees pursuant to Va. Code §

55.1-403 for her fraudulent and/or improper transfers in violation of Va. Code §

55.1-400, *et. seq.*

## COUNT I: DENIAL OF DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)
### (Fraud - on behalf of Mr. Kamin)

96.     Plaintiffs incorporate, repeat, and re-allege all allegations set forth in the paragraphs

above.

97.     Section 523(a)(2) of the Bankruptcy Code provides, in relevant part, that an

individual debtor may not obtain a discharge from any debt –

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to
> the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement
> respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money,
> property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive. . .

11 U.S.C. § 523(a)(2).

98.     Ms. Gunkova used deception, fraud, false pretense, and/or misrepresentations in

connection with her fraudulent inducement of Mr. Kamin to join BNG as a 50% Class A Member

and Co-Manager and to contribute millions of dollars under the guise that Mr. Kamin would be

transferred 50% Class A membership interest in BNG and would be a Manager of BNG, that Ms.

Gunkova would not act on behalf of BNG without the consent of Mr. Kamin; and that monies

33

contributed by Mr. Kamin to BNG would be used solely for BNG business and expenses. Ms. Gunkova's fraudulent inducement included the signing of an Operating Agreement memorializing the terms of the parties' agreement, when in fact, Ms. Gunkova never intended to abide by the agreement.

99.     Ms. Gunkova used deception, fraud, false pretense, and/or misrepresentations in connection with her knowing and voluntary material breaches of the parties' Operating Agreement, including stealing Mr. Kamin's identity and forging his signature to obtain his "approval" to act on behalf of BNG.

100.     Ms. Gunkova knew the representations she made to Mr. Kamin to induce him into joining BNG were false and that she had no intent on following through with her promises. Ms. Gunkova also knew that the statements and documents she was submitting to financial institutions and the federal government purporting to be Mr. Kamin were false.

101.     Ms. Gunkova used deception, fraud, false pretense, and/or misrepresentations in connection with her conspiracy and fraud against Mr. Kamin to steal his identity and forge his signature on documents to seek and obtain financial loans for the benefit of Ms. Gunkova, her related entities, and her boyfriend Mr. Bogatin.

102.     Ms. Gunkova had an obligation to submit truthful information to Mr. Kamin and the financial institutions for which she submitted Mr. Kamin's information and allegedly signed documents. Instead, Ms. Gunkova failed to be truthful and disclose accurate information by working together with Mr. Bogatin to accomplish their scheme.

103.     Ms. Gunkova's representations to Mr. Kamin did in fact induce Mr. Kamin to join BNG and to contribute millions of dollars to BNG. Mr. Kamin's reliance on the representations was justified.

CORE/3529060.0002/185282874.1

104.   Mr. Kamin has suffered damages as a proximate result of the false pretenses, false representations and/or actual fraud of Defendant:

     i.    in an amount no less than $2,216,342.78, plus interest at the statutory rate, for her willful breaches of the parties' Operating Agreement;

    ii.    in an amount no less than $2,273,842.78, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) for her fraudulent inducement of Mr. Kamin;

   iii.    in an amount no less than $4,773,842.78, plus prejudgment interest, treble damages totaling no less than $14,321,528.34, and attorneys' fees, and costs for her conspiracy against Mr. Kamin;

   iv.    in an amount no less than $2,500,000.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) for her fraud against Mr. Kamin; and

    v.    in an amount no less than $94,322.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to Va. Code § 55.1-403 for her fraudulent and/or improper transfers in violation of Va. Code § 55.1-400, *et. seq.*

105.   Ms. Gunkova is not entitled to a discharge of any obligation to Mr. Kamin found to fall within 11 U.S.C. § 523(a)(2).

WHEREFORE, Mr. Kamin requests that this Court enter an order: (i) determining that Ms. Gunkova is not entitled to a discharge of any indebtedness to Mr. Kamin as set forth above; and (ii) granting such other and further relief in favor of Mr. Kamin as the Court deems just and proper.

35

## COUNT II: DENIAL OF DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)
### (Fraud - derivatively on behalf of BNG)

106.    Plaintiffs incorporate, repeat, and re-allege all allegations set forth in the paragraphs above.

107.    Section 523(a)(2) of the Bankruptcy Code provides, in relevant part, that an individual debtor may not obtain a discharge from any debt –

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive...

11 U.S.C. § 523(a)(2).

108.    Ms. Gunkova used deception, fraud, false pretense, and/or misrepresentations in connection with her breaches of fiduciary duties to BNG, including but not limited to her conversion of BNG to herself, her related entities, and Mr. Bogatin, her fabrication of documents and forgery of Mr. Kamin's signature, her theft of Mr. Kamin's identity, her co-mingling of BNG assets with the assets of her other entities, and her improper tax records and causing BNG's tax records to be improperly filed containing false information.

109.    Ms. Gunkova knew the statements to be false, but made them with the intent to deceive BNG (and others) to benefit herself and her related parties;

110.    BNG has suffered damages as a proximate result of the false pretenses, false representations and/or actual fraud of Ms. Gunkova as follows:

CORE/3529060.0002/185282874.1

i.   in an amount no less than $2,366,342.78, plus interest at the statutory rate, and attorney's fees pursuant to Va. Code § 13.1-1045 for her breaches of her fiduciary duties to BNG;

ii.  in an amount no less than $1,357,052.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) and Va. Code § 13.1-1045 for her conversion of BNG funds; and

iii. in an amount no less than $94,322.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to Va. Code §§ 13.1-1045 and 55.1-403 for her fraudulent and/or improper transfers in violation of Va. Code § 55.1-400, *et. seq.*

111.   Ms. Gunkova is not entitled to a discharge of any obligation to BNG found to fall within 11 U.S.C. § 523(a)(2).

WHEREFORE, BNG requests that this Court enter an order: (i) determining that Ms. Gunkova is not entitled to a discharge of any indebtedness to BNG for the amounts set forth above; and (ii) granting such other and further relief in favor of BNG as the Court deems just and proper.

## COUNT III: DENIAL OF DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(6)
### (Willful And Malicious Injury - on behalf of Mr. Kamin)

112.   Plaintiffs incorporate, repeat, and re-allege all allegations set forth in the paragraphs above.

113.   Section 523(a)(6) of the Bankruptcy Code provides, in relevant part, that an individual debtor may not obtain a discharge from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).

CORE/3529060.0002/185282874.1

114.    A debtor's injurious act done "'deliberately and intentionally in knowing disregard of the rights of another' . . . is sufficiently willful and malicious, and prevents discharge of the debt," even if the debtor bears the creditor no ill will.  *In re Stanley*, 66 F.3d 664, 667 (4th Cir. 1995).

115.    The conduct of Ms. Gunkova was more than negligence, gross negligence or reckless conduct and constitutes acts done with the actual intent to cause injury.  Ms. Gunkova 1) caused damages to Mr. Kamin; 2) such injury was the result of an act of Ms. Gunkova; 3) the act was both willful and malicious.

116.    As a result of Ms. Gunkova's misconduct, Mr. Kamin has been willfully harmed as follows:

i.      in an amount no less than $2,216,342.78, plus interest at the statutory rate, for her willful breaches of the parties' Operating Agreement;

ii.     in an amount no less than $2,273,842.78, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) for her fraudulent inducement of Mr. Kamin;

iii.    in an amount no less than $4,773,842.78, plus prejudgment interest, treble damages totaling no less than $14,321,528.34, and attorneys' fees, and costs for her conspiracy against Mr. Kamin;

iv.     in an amount no less than $2,500,000.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) for her fraud against Mr. Kamin; and

CORE/3529060.0002/185282874.1

     v.      in an amount no less than $94,322.00, plus interest at the statutory rate, punitive

damages in the amount of $350,000, and attorney's fees pursuant to Va. Code §

55.1-403 for her fraudulent and/or improper transfers in violation of Va. Code §

55.1-400, *et. seq.*

117.    Ms. Gunkova is not entitled to a discharge of any obligation to Mr. Kamin found to

fall within 11 U.S.C. § 523(a)(6).

WHEREFORE, Mr. Kamin requests that this Court enter an order: (i) determining that Ms.

Gunkova is not entitled to a discharge of any indebtedness to Mr. Kamin for the amounts set forth

above; and (ii) granting such other and further relief in favor of Mr. Kamin as the Court deems just

and proper.

## COUNT IV: DENIAL OF DISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(6) (Willful And Malicious Injury - derivatively on behalf of BNG)

118.    Plaintiffs incorporate, repeat, and re-allege all allegations set forth in the paragraphs

above.

119.    Section 523(a)(6) of the Bankruptcy Code provides, in relevant part, that an

individual debtor may not obtain a discharge from any debt "for willful and malicious injury by

the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

120.    A debtor's injurious act done "'deliberately and intentionally in knowing disregard

of the rights of another' . . . is sufficiently willful and malicious, and prevents discharge of the

debt," even if the debtor bears the creditor no ill will. *In re Stanley*, 66 F.3d 664, 667 (4th Cir.

1995).

121.    The conduct of Ms. Gunkova was more than negligence, gross negligence or

reckless conduct and constitutes acts done with the actual intent to cause injury. Ms. Gunkova's

actions were willful and malicious.

122. As a result of Ms. Gunkova's misconduct, BNG has been willfully harmed as follows:

    i.  in an amount no less than $2,366,342.78, plus interest at the statutory rate, and attorney's fees pursuant to Va. Code § 13.1-1045 for her breaches of her fiduciary duties to BNG;

    ii. in an amount no less than $1,357,052.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to *Prospect Development Co. v. Bershader*, 258 Va. 75 (1999) and Va. Code § 13.1-1045 for her conversion of BNG funds; and

    iii. in an amount no less than $94,322.00, plus interest at the statutory rate, punitive damages in the amount of $350,000, and attorney's fees pursuant to Va. Code §§ 13.1-1045 and 55.1-403 for her fraudulent and/or improper transfers in violation of Va. Code § 55.1-400, *et. seq.*

123. Ms. Gunkova is not entitled to a discharge of any obligation to BNG found to fall within 11 U.S.C. § 523(a)(6).

WHEREFORE, BNG requests that this Court enter an order: (i) determining that Ms. Gunkova is not entitled to a discharge of any indebtedness to BNG for the amounts set forth above; and (ii) granting such other and further relief in favor of BNG as the Court deems just and proper.

Dated: October 30, 2023                    Respectfully submitted,

                                           /s/ Tracey M. Ohm
                                           Marc E. Albert, No. 26096
                                           Tracey M. Ohm, No. 77150
                                           STINSON LLP
                                           1775 Pennsylvania Ave., N.W., Suite 800
                                           Washington, DC 20006
                                           Tel. (202) 728-3020; Fax (202) 572-9999
                                           marc.albert@stinson.com
                                           tracey.ohm@stinson.com

CORE/3529060.0002/185282874.1

and

Bethany R. Benes, No. 85408
BETHUNE BENES, PLLC
3975 Fair Ridge Drive
South Suite 246
Fairfax, Virginia 22033
Tel.: (703) 260-9325
bbenes@bethunebenes.com

*Counsel for Harry Kamin and BNG Group LLC*