**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  02-157** |
| | : | **DATE FILED:** _____ |
| **v.** | : | **VIOLATIONS:** |
| **SEMION MOGILEVICH,** | | **RICO Conspiracy (1 Count)** |
| a/k/a "Simeon Mogilevitch" | : | **18 U.S.C. § 1962(d)** |
| a/k/a "Semjon Mogilevcs" | | **Wire Fraud (22 Counts)** |
| a/k/a "Shimon Makhelwitsch" | : | **18 U.S.C. § 1343** |
| a/k/a "Seva" | | **Mail Fraud (6 Counts)** |
| **IGOR FISHERMAN** | : | **18 U.S.C. § 1341** |
| **JACOB BOGATIN** | : | **Securities Fraud (1 Count)** |
| a/k/a "Yakov" | : | **15 U.S.C. §§ 78j(b), 78ff(a)** |
| **ANATOLY TSOURA** | | **17 C.F.R. § 240.10b-5** |
| | | **Filing False Registration Statement with the** |
| | : | **SEC (1 Count )** |
| | | **15 U.S.C. §§ 78l(g), 78ff(a)** |
| | | **17 C.F.R. § 240.12b-20** |
| | : | **False Filings with the SEC (2 Counts)** |
| | | **15 U.S. C. §§ 78m(a), 78 ff(a)** |
| | : | **17 C.F.R. §§ 240.12b-20, 240.13a-1,** |
| | | **240.13a-3, 240.13a-16** |
| | : | **Falsification of Books and Records (1** |
| | | **Count)** |
| | : | **15 U.S.C. §§ 78m(b)(5), 78ff(a)** |
| | | **and 17 C.F.R. § 240.13b2-1** |
| | | **Money Laundering Conspiracy (1 Count)** |
| | | **18 U.S.C. § 1956(h)** |
| | : | **Money Laundering   (4 Counts)** |
| | | **18 U.S.C. § 1956(a)(2)(A)** |
| | | **Money Laundering (6 Counts)** |
| | : | **18 U.S.C. § 1956(a)(2)(B)(i)** |
| | | **Aiding and Abetting** |
| | : | **18 U.S.C. § 2** |
| | | **Forfeiture (Racketeering)** |
| | : | **18 U.S.C. § 1963** |
| | | **Forfeiture (Money Laundering)** |
| | : | **18 U.S.C. §982** |

**SUPERSEDING INDICTMENT**

PLAINTIFF'S
EXHIBIT

1

**THE GRAND JURY CHARGES:**

## INTRODUCTION

### The Scheme to Defraud

1.      From in or about 1993, and continuing up to and including in or about

September 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

together with others known and unknown to the grand jury, devised and intended to devise a

scheme and artifice to defraud thousands of investors in the United States, Canada, and

elsewhere, and to obtain money and property by means of false and fraudulent pretenses,

representations and promises ("the scheme to defraud").

### Plan and Purpose of the Scheme To Defraud

2.      It was part of the plan and purpose of the scheme to defraud that the

defendants:

(a)      created and controlled a publicly-owned company in North America which

became known as YBM MAGNEX INTERNATIONAL, INC. ("YBM");

(b)      used a network of companies in the Eastern District of Pennsylvania,

Canada, Eastern Europe and elsewhere, which included fraudulently

2

operated businesses, described herein as "the Network of YBM

companies," see paragraphs 10 to 19 of the Introduction below;

(c)  acquired millions of shares of YBM stock at minimal cost to the

defendants;

(d)  deceived securities regulators through efforts to secure approval for listing

and sale of YBM stock on securities exchanges and markets in Canada and

the United States; and

(e)  fraudulently inflated the price of YBM stock by falsely reporting and

representing to investors and securities regulators that YBM was a highly

profitable and investment-worthy enterprise which generated high

revenues from the worldwide sale and distribution of magnets and other

products.

3.    It was a further part of the plan and purpose of the scheme to defraud that

the defendants were to carry out the conduct referenced above in paragraph 2, through the

manner and means of the scheme to defraud as set forth in paragraphs 29 to 46 of the

Introduction, in order to:

(a)  defraud the investing public into purchasing millions of shares of YBM

stock on the Canadian exchanges and through brokers in the United States;

(b)  enable the defendants to profit unjustly, and enrich themselves, by selling

millions of dollars of YBM stock at fraudulently inflated prices;

(c)  enable certain of the defendants to enrich themselves by paying themselves

large salaries and bonuses and granting themselves stock options and

personal loans; and

(d)      enable the defendants to use the proceeds from the public offering of YBM

stock to further the fraudulent operations of the Network of YBM

companies, and thereby conceal and continue the fraudulent scheme to

defraud.

4.      As a result of the scheme to defraud, the defendants caused the defrauded

shareholders of YBM to lose in excess of $150 million (all references are to U.S. dollars unless

otherwise designated as Canadian dollars (CDN)) in funds invested in the purchase of YBM

stock.

5.      As a result of their participation in the scheme to defraud, each defendant,

either directly or through nominees, enriched himself with proceeds of the scheme to defraud,

totaling at least the following approximate amounts, from the sale of YBM stock, and other

compensation including salary, bonuses, stock options, commissions and  personal loans:

|     | Defendant | Amount |
|-----|-----------|--------|
| (a) | MOGILEVICH | $ 18.4  million |
| (b) | FISHERMAN | $  3     million |
| (c) | BOGATIN | $ 10    million |
| (d) | TSOURA | $   1.3 million |

## The Defendants

6.      SEMION MOGILEVICH, a/k/a "Simeon Mogilevitch," a/k/a "Semjon

Mogilevcs," a/k/a "Shimon Makhelwitsch," a/k/a "Seva," was born in Kiev, Ukraine and holds

Ukrainian, Russian and Israeli citizenship.  At various times relevant to this Superseding

4

Indictment, MOGILEVICH resided in Budapest, Hungary.   MOGILEVICH provided the funds

and authorized the formation of the Network of YBM companies described herein.  He exercised

control over the companies through: (a) his ownership and control of YBM stock; (b) his

relationship with defendants IGOR FISHERMAN and JACOB BOGATIN, who held key

executive positions within YBM and the Network of YBM companies; and (c) his influence over

persons, activities, and the bank accounts of the various companies comprising the Network of

YBM companies.   MOGILEVICH funded, authorized and directed the scheme to defraud, and

conducted the affairs of the Mogilevich Enterprise as set forth in paragraphs 2 and 3 of Count

One,  from his office headquarters located at 44 Benczur Street, Budapest, Hungary, among other

locations.

       7.    IGOR FISHERMAN was born in L'Vov, Ukraine, entered the United

States in or about 1990, and became a naturalized United States citizen in or about October 1995.

FISHERMAN also holds Israeli citizenship.  While in the United States, FISHERMAN lived at

various addresses in Buffalo, New York, Mt. Laurel and Cherry Hill, New Jersey, and

Huntingdon Valley, Pennsylvania.   FISHERMAN served as a member of YBM's Board of

Directors.  FISHERMAN held various executive positions within the Network of YBM

companies, including: Chief Operating Officer of YBM; President of UNITED TRADE LTD, and

its predecessor ARIGON COMPANY LTD., YBM's main subsidiary companies described below

at paragraphs 13 and 14.  In these positions FISHERMAN exercised daily control over YBM's

operations in Eastern Europe.   He was a close associate and top financial advisor to defendant

MOGILEVICH.  As part of the scheme to defraud,  FISHERMAN was instrumental in directing

the movement of money through bank accounts and brokerage accounts held in the names of

nominees, closely-related parties, and shell companies.  FISHERMAN coordinated, supervised and implemented the scheme to defraud from MOGILEVICH's headquarters at 44 Benczur Street in Budapest, Hungary, among other locations.

8.    JACOB BOGATIN, a/k/a "Yakov," was born in Saratov, Russia. BOGATIN entered the United States in or about 1987 and became a naturalized United States citizen in or about January 1993.  BOGATIN held various executive positions within the Network of YBM companies, including: President and Chief Executive Officer of YBM MAGNEX, INC., described below at paragraph 15,  from March 1994 until at least September 1998, and President, Chief Executive Officer and a member of the Board of Directors of YBM from late 1995 until at least September 1998.   Through these positions, BOGATIN was involved in the daily control and supervision of YBM's operations in the United States and abroad, including those in Budapest, Hungary.  BOGATIN coordinated, supervised and  implemented  the scheme to defraud from YBM headquarters in the Eastern District of Pennsylvania, among other locations.

9.    ANATOLY TSOURA was born in Russia and served as the Vice President of Finance for YBM's subsidiaries ARIGON CO., LIMITED and UNITED TRADE, LIMITED, see paragraphs 13 and 14 below, from approximately 1995, until at least September 1998. TSOURA was not a citizen of the United States.  Under the direction of defendant FISHERMAN,  TSOURA was responsible for, among other things, the compilation of UNITED TRADE's financial records and  the preparation of false purchase orders, invoices and other documentation to support bogus commercial transactions.  TSOURA implemented and participated in the scheme to defraud from the Budapest, Hungary location of UNITED TRADE, among other places.

### The Network of YBM Companies

**YBM Magnex International, Inc.  - The Parent Company**

10.     YBM MAGNEX INTERNATIONAL, INC., a public corporation, was
registered in Calgary, Alberta, Canada, as "PRATECS TECHNOLOGIES, INC." ("PRATECS")
on or about March 16, 1994.  In or about November 1995, the name "PRATECS" was changed
to YBM MAGNEX INTERNATIONAL, INC.  (variously referred to herein as "PRATECS,"
"PRATECS/YBM" and "YBM").

11.     From approximately March 16, 1994 to late 1995, YBM's offices were
located at 2935 Byberry Road, Hatboro, Bucks County in the Eastern District of Pennsylvania.
From in or about late 1995 to at least September 1998, YBM's international corporate
headquarters were located at 110 Terry Dr., Newtown, Bucks County in the Eastern District of
Pennsylvania.

12.     YBM, and its subsidiaries, represented to the investing public, to securities
regulators, and to auditors and accountants, that YBM's primary business was the manufacture
and worldwide distribution of custom-made, precision-designed, neodymium magnets which were
manufactured at its plant in Budapest, Hungary, and sold throughout the United States, Canada,
Europe and the Middle East, among other locations.  YBM also represented that its business
operations included the manufacture and distribution of magnetic products, a computer software
security system called "CatchDisk," and the refinement and sale of crude oil.

**YBM's Subsidiaries**

13.     ARIGON COMPANY LIMITED ("ARIGON") was an off-shore
company, incorporated in the Channel Islands, United Kingdom on or about May 24, 1990.

7

Defendant MOGILEVICH was a 40% shareholder of ARIGON, and directed and controlled its operations.  ARIGON operated as a trader of commodities and consumer goods which were purchased in Western Europe and North America, and resold in Eastern Europe, including Russia and Ukraine.  In or about December 1994, as part of the scheme to defraud, ARIGON was acquired by YBM MAGNEX, INC. ("YBM MAGNEX"), a Pennsylvania corporation set up by defendant BOGATIN.  ARIGON became a subsidiary of YBM, the public corporation, in or about November 1995.  ARIGON remained a subsidiary of YBM until April 1, 1996 when its assets were transferred to UNITED TRADE LIMITED ("UNITED TRADE").  ARIGON was dissolved in 1997.  ARIGON's  two subsidiaries were:

(a)     MAGNEX VALLALKOZOI RT  ("MAGNEX RT"), a Hungarian corporation, located in Budapest.  MAGNEX RT became a subsidiary of ARIGON in or about October 1992.  MAGNEX RT owned the manufacturing plant  in Budapest, Hungary, which purportedly produced YBM's neodymium magnets.  ARIGON was to market, sell and distribute the magnets produced by MAGNEX RT, and was to purchase raw materials on behalf of MAGNEX RT.  MAGNEX RT became a subsidiary of UNITED TRADE on or about April 1, 1996, when ARIGON transferred its assets to UNITED TRADE.

(b)     ARBAT INTERNATIONAL, INC. ("ARBAT"), a Russian company located in Moscow, was formed by ARIGON in or about July 1991 to conduct trading activity in Russia.  ARIGON divested itself of ARBAT on or about April 1, 1996.  Thereafter, ARBAT was no longer within the

8

YBM Network of companies and did not become a subsidiary of UNITED

TRADE.

14.    UNITED TRADE LIMITED ("UNITED TRADE") was an offshore

company incorporated in the Cayman Islands, British West Indies, on or about February 6, 1996.

UNITED TRADE was the successor company to ARIGON and became a wholly owned

subsidiary of YBM on or about April 1, 1996.  At that time, the assets of ARIGON, including

MAGNEX RT and the Budapest manufacturing plant, were transferred to UNITED TRADE.

Thereafter UNITED TRADE was the marketing, sales and distribution arm of YBM, and was the

core subsidiary which controlled transactions involving  hundreds of millions of dollars primarily

from purported magnet sales and other business activity, including oil.  UNITED TRADE

maintained a registration address in the Cayman Islands, but its operations were centered in

Budapest, Hungary and were directed principally by defendant FISHERMAN with the assistance

of defendant TSOURA.

15.    YBM MAGNEX, INC. ("YBM MAGNEX"), a Pennsylvania corporation,

was incorporated on or about February 10, 1994, by defendant BOGATIN who served as

President at all times relevant to the Superseding Indictment.   YBM MAGNEX was initially

located at 2935 Byberry Road in Hatboro, Pennsylvania and was a shell company set up in the

United States to acquire ARIGON.  YBM MAGNEX acquired ARIGON  in or about December

1994.  Subsequently, in or about November 1995, YBM MAGNEX became a wholly owned

subsidiary of YBM and thereafter was operated from headquarters in Newtown, Pennsylvania.


**Related Companies**

9

16.     YBM TECHNOLOGIES, INC. ("YBM TECHNOLOGIES"), a
Pennsylvania corporation, was incorporated on May 13, 1991 and owned by defendant
BOGATIN, who served as President at all times relevant to this Superseding Indictment until its
assets were sold to YBM.  YBM TECHNOLOGIES was located at 2935 Byberry Road in
Hatboro, Pennsylvania.   From approximately 1993 to August 1996, YBM TECHNOLOGIES
served primarily as a purported vendor to YBM, providing consulting services, research and
development, equipment and other magnetic products. YBM TECHNOLOGIES was not a YBM
subsidiary company, but its assets were acquired by YBM from BOGATIN in or about August
1996.

17.     TECHNOLOGY DISTRIBUTION LIMITED ("TDL") was an offshore
company incorporated in the Isle of Man, United Kingdom, in or about 1994.  Defendant
MOGILEVICH directed the creation of TDL, and at all times relevant to this Superseding
Indictment was the beneficial owner and controlled its operations.  From approximately 1995 to
approximately February 1997, funds in TDL's  bank accounts in Budapest were reported as cash
assets on the books and records of ARIGON, and later UNITED TRADE.   TDL served as an
agent of UNITED TRADE from approximately April 1996 until early 1997.  Thereafter, TDL
acted as a purported vendor of UNITED TRADE.

18.     ORIGON COMPANY LIMITED ("ORIGON") was an offshore company
incorporated on the island of Nevis in the Caribbean in or about June of 1995.  FISHERMAN
directed the creation of ORIGON.  Defendants FISHERMAN and MOGILEVICH at all times
relevant to this Superseding Indictment were the beneficial owners of ORIGON and controlled its
operations.  From approximately June of 1995 to approximately February 1997, funds in

ORIGON's bank account in Israel were reported as cash assets on the books and records of

ARIGON, and later UNITED TRADE.   ORIGON served as an agent of UNITED TRADE from

approximately April 1996 until early 1997.  Thereafter, ORIGON acted as a purported customer

of UNITED TRADE.

19.    BRITISH EUROPEAN MARKETING LTD.  ("BEM") was a private

limited company incorporated in Cardiff, Wales, United Kingdom on or about January 19, 1996.

BEM was formed by a former officer of ARIGON and a close associate of defendant

MOGILEVICH to act as an agent of UNITED TRADE in the oil and petroleum industry.  Its

operations were conducted primarily in London, England.  From approximately March of 1996

through May of 1997, funds in BEM's bank account in London were reported as cash assets on

the books and records of UNITED TRADE.  BEM served as an agent of UNITED TRADE from

approximately April 1996 until May 1997.

## The Securities Regulators

20.    The United States Securities and Exchange Commission ("SEC") was an

independent agency of the United States government that regulated the securities industry within

the United States.  This included the regulation of the over-the-counter ("OTC") securities

market, that is, securities traded directly between securities brokerage firms and between

brokerage firms and individuals.

21.    The National Association of Securities Dealers, Inc. ("NASD") was a self-

regulatory organization of the United States securities industry responsible for the regulation of

the OTC securities market, including the NASDAQ ("National Association of Securities Dealers

Automated Quotation System") Stock Market.  The NASD enforced its rules and regulations for

the protection of investors in securities and promoted observance of United States federal and

state securities laws by its members.  The NASDAQ Stock Market was an electronic, computer

screen–based market that enabled securities firms to execute transactions for investors in the

companies that are listed on NASDAQ.   Companies that were listed on the NASDAQ were

required to comply with the NASD's rules and regulations, as well as those of the SEC, in order

to maintain their listing on the NASDAQ.

22.    The Alberta Securities Commission ("ASC") was a governmental

regulatory body  in Canada which administered and enforced Canadian securities legislation and

regulations in the province of Alberta,  including supervisory oversight of the regulations of the

Alberta Stock Exchange.

23.    The Alberta Stock Exchange ("ASE") was a self-regulatory organization

located in Calgary, Canada that provided a securities market for the trading of securities and

monitored and enforced compliance with the Canadian securities regulations of its exchange.

The ASE had a program for start-up companies with no significant assets or business, known as

Junior Capital Pool ("JCP"), which provided such companies easier access to listing on the ASE

in order to raise capital to conduct business in Canada.  Companies had to satisfy and comply with

specific requirements and regulations of the ASE in order to avail themselves of this type of

listing.

24.    The Ontario Securities Commission ("OSC") was a governmental

regulatory body in Canada which administered and enforced securities legislation and regulations

in the province of Ontario, including supervisory oversight of the regulations of the Toronto

Stock Exchange.

25.     The Toronto Stock Exchange ("TSE") was a self-regulatory organization located in Toronto, Canada that provided a securities market for the trading of securities, and monitored and enforced compliance with the Canadian securities regulations of its exchange.

**The Auditors**

26.     Coopers and Lybrand ("Coopers") was an international public accounting firm with an office in Budapest, Hungary, among other locations.  Coopers was contacted between September 1993 and March 1994 to serve as an independent accounting firm to audit and certify MAGNEX RT's financial statements for the years 1992, 1993 and 1994.  Certification of the financial statements was a prerequisite to approval by the securities regulators for any public offering of PRATECS/YBM stock.  Coopers declined to serve as MAGNEX RT's auditors.  Coopers did conduct a valuation of machinery and equipment and other assets of MAGNEX RT in or about June 1994.

27.     Parente, Randolph, Orlando, Carey and Associates ("Parente") was a public accounting firm with offices in Plymouth Meeting and Media, Pennsylvania, among other locations.  Parente was retained by YBM from approximately February 1995 to approximately March 1998 as the independent public accounting firm to audit and certify the accuracy of YBM's financial statements for years 1992, 1993, 1994, 1995 and 1996.  Certification of the financial statements by Parente was a prerequisite to approval by the securities regulators to list and trade YBM stock, and to sell additional stock through public offerings.

28.     Deloitte & Touche LLP ("Deloitte") was an international public accounting firm with an office in Philadelphia, Pennsylvania, among other locations.  Deloitte was retained by YBM  from approximately June 1997 to approximately June 1998 as the independent accounting

firm to audit and certify YBM's  annual financial statements for the years 1996 and 1997.

Certification of the financial statements by Deloitte was a prerequisite to securing approval from

the securities regulators to list and trade YBM stock and to sell additional stock through public

offerings.   Deloitte resigned as YBM's auditor in or about June 1998, and refused to certify

YBM's financial statements for calendar year 1997.

## **Manner and Means To Accomplish the Scheme To Defraud**

Among the manner and means by which the defendants carried out and implemented the

scheme to defraud were the following:

### A.    OVERVIEW

29.    In order to sell securities to the public and maintain public

trading of its securities in the United States and Canada, YBM was required to comply with

provisions of Canadian and United States federal securities laws, including the  Securities

Exchange Act of 1934 and regulations promulgated thereunder.  These laws and regulations were

designed to ensure, among other things, (a) that the identities of those individuals in control of the

company, and their financial interests in the company, were fully disclosed to the public, and (b)

that the company's financial information and operations were accurately and honestly recorded

and reported to the public.

30.    It was part of the scheme to defraud that the defendants made false,

deceptive and misleading statements of material matters to, and concealed material matters from,

the investing public, including YBM shareholders, the securities regulators in Canada and the

United States, and the company's auditors and forensic examiners, in that the defendants:

(a)    concealed defendant MOGILEVICH's ownership of and control over the

Network of YBM companies, including his beneficial ownership of YBM stock;

(b)    engaged in various deceptive business practices, including the creation of fraudulent books and records, that were designed to conceal YBM's fraudulent operations from securities regulators, auditors and the investing public.  This included: (a) creating false bank statements, invoices, customer lists, shipping documentation and audit confirmations to support false claims of sales activities and revenues; and (b) funneling proceeds from the sale of YBM stock to closely-related parties and entities to create the false appearance of commercial transactions on YBM's books and records;

(c)    used various techniques to fraudulently inflate the value of YBM stock and to create market demand for the artificially inflated stock, in order to profit from sales of YBM stock owned and controlled by the defendants, in that the defendants falsely touted the business activity and financial performance of the Network of YBM Companies through, among other things, the issuance of press releases, shareholder presentations, and annual and periodic reports filed with securities regulators; and

(d)    implemented the scheme to defraud using companies and bank accounts in over twenty different countries, including offshore locations such as the Republic of Nauru in the South Pacific, the Cayman Islands and Nevis in the Caribbean, as well as Canada, England, Hungary, Israel, Lithuania,

15

Ukraine and Russia, in order to make it more difficult for law enforcement

authorities, securities regulators, as well as YBM's auditors and forensic

examiners, to uncover the true nature of their criminal operations.

**B.    THE GENESIS OF THE NETWORK OF YBM COMPANIES**

31.    Commencing in or about January 1993, the defendants, MOGILEVICH,

FISHERMAN and BOGATIN, and others known and unknown to the grand jury, formulated

plans to establish and control a new, publicly-owned company in North America (which became

known first as PRATECS, and later as YBM).  It was part of the scheme to defraud that this

publicly-owned company would be given the appearance of an international magnet manufacturer

and distributor, and would be structured in such a way that it could sell its stock on the securities

exchanges, first in Canada and, eventually, in the United States.   It was the defendants' intention

to build the scheme around a Canadian publicly-owned company because the defendants believed

securities regulations in Canada were more lenient than in the United States, and provided the

easiest access to the North American capital markets.

32.    To carry out this scheme to defraud, in a series of corporate mergers and

acquisitions involving companies owned and controlled by defendant MOGILEVICH, namely,

YBM MAGNEX, ARIGON, MAGNEX RT and ARBAT, as set forth in paragraphs 32a-32e

below, the defendants took the following steps, among others, to create the publicly-owned

company, PRATECS/YBM, and to ensure that MOGILEVICH would have effective control of

the resulting publicly-owned company.

(a)    Defendant MOGILEVICH authorized and financed the plans to fund this

venture by providing seed money totaling approximately $2.4 million through his offshore

16

company ARIGON between approximately February 1993 and November 1995.   This money was funneled through bank accounts of ARIGON to bank accounts controlled by defendant BOGATIN in the Eastern District of Pennsylvania, in order to pay expenses related to the creation, promotion, and operation of the public company, as well as to acquire stock of the public company.

(b)    In or about February 1994, the defendants, MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand jury, caused the creation of YBM MAGNEX in Pennsylvania.  Subsequently, in or around December 1994, as part of the scheme to defraud, YBM MAGNEX acquired ARIGON as a wholly-owned subsidiary, along with ARIGON's subsidiaries, MAGNEX RT and ARBAT.

(c)    In or about March 1994, the defendants, MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand jury, caused the creation of PRATECS, the Canadian shell corporation, that was to become the public company. Defendant BOGATIN served as a Director of PRATECS/YBM from the time of its creation until at least September 1998.  PRATECS became a publicly-owned company in July 1994 through a public offering of its stock in Canada.

(d)    On or about October 31, 1995, PRATECS  acquired YBM MAGNEX and its wholly-owned subsidiaries, ARIGON, MAGNEX RT, and ARBAT.  Thereafter, in or about November 1995, PRATECS changed its name to YBM MAGNEX INTERNATIONAL, INC.

(e)    In or about April 1996, UNITED TRADE became a wholly-owned subsidiary of YBM.  UNITED TRADE acquired the assets of ARIGON, including the

Budapest manufacturing plant and was the primary company through which magnet sales

and other commercial transactions were conducted.  Defendant FISHERMAN served as

President of UNITED TRADE from its inception until at least August 1998, when he was

forced to resign.

### C.    CONTROL OVER YBM

**Control of Management**

33.    At all times relevant to the period of the Superseding Indictment,

defendants FISHERMAN, BOGATIN and TSOURA used their various executive positions

within the Network of YBM companies to control the operations of the Network of YBM

companies and, thereby, carry out the scheme to defraud.   As a result, defendants FISHERMAN,

BOGATIN and TSOURA were able to act for, and on behalf of, defendant MOGILEVICH, and

to follow his directives and implement his objectives in executing the scheme.

**Control Through Ownership of Stock**

34.    Between approximately  February 1994 and November 1995, defendants

MOGILEVICH, FISHERMAN and BOGATIN, and others known and unknown to the grand

jury, orchestrated a series of corporate and financial transactions (see paragraphs 32(b)-32(d)

above) that, among other things, were designed to enable MOGILEVICH, FISHERMAN and

BOGATIN to acquire a controlling stock interest in PRATECS/YBM that continued until at least

May 1998.

(a)    As a result of the said corporate transactions that occurred in 1994

and 1995,  MOGILEVICH and five close Russian business associates, the ARIGON

shareholders, received approximately 18.7 million shares of PRATECS stock in exchange

for stock in YBM MAGNEX.  As a result, by the end of November 1995, defendants

MOGILEVICH, FISHERMAN and BOGATIN, directly and indirectly, owned and

controlled over 80% of the issued and outstanding stock of PRATECS/YBM.

(b)    From in or about January 1996 through in or about May 1998,

approximately 16  million additional shares of YBM were sold to the investing public in

additional offerings through fraudulent means described below.  The defendants took

profits from the fraudulent scheme by selling millions of shares of YBM stock as described

below (see paragraphs 43 through 45 of the Introduction).

## D.    FRAUDULENT, FALSE AND DECEPTIVE PRACTICES

35.    Between approximately 1994 and September 1998, defendants

MOGILEVICH, FISHERMAN, BOGATIN and TSOURA employed the following fraudulent,

false and deceptive practices regarding YBM's business operations, financial condition,

management and control in order to make YBM look profitable and investment worthy.  In

addition, these practices were designed to conceal the fraudulent activities described herein and

MOGILEVICH's ownership and control of the Network of YBM companies from securities

regulators, auditors, forensic examiners (hired by YBM's Board of Directors  to examine the

operations, books and records of the company), market analysts and the investing public.

### Bribes Offered to Auditors

(a)    Defendant FISHERMAN offered cash bribes in the amount of

$500,000 to accountants, in or about March 1994, to prepare and issue a false audit report

favorable to the company MAGNEX RT, which offer was refused.

### Deceiving the Auditors/Examiners

(b)      Defendants FISHERMAN, BOGATIN and TSOURA, in order to conceal the falsification of the books and records of the Network of YBM companies described below at paragraph 35(c), at various times between 1994 and 1998, routinely deceived, obstructed, and lied to the auditors, and to the forensic examiners who examined the books and records of YBM and its subsidiaries by, among other things:

(1)      falsely representing that the books and records of YBM and the Network of YBM Companies were accurate when they were not;

(2)      providing false financial records, bank statements, invoices, contracts, customer  lists, shipping documentation and audit confirmations, which were created to support false claims of sales activity and revenues;

(3)      systematically withholding access to records and documentation essential to substantiate the accuracy of YBM's statements of its financial condition, by using "put-offs," stalling tactics, and false promises of production; and

(4)      failing to disclose to the auditors the material matters as set forth in paragraph 37 below.

**Falsification of Books and Records**

(c)      Defendants MOGILEVICH, FISHERMAN, BOGATIN and

TSOURA, in order to make YBM's financial statements look profitable and attractive to

investors, recorded, and caused to be recorded, in YBM's books and records at various

times between 1994 and 1998:

(1)     tens of millions of dollars of fictitious magnet-related transactions

that were either: (i) non-existent; (ii) generated from the sales in

Europe of consumer goods, food commodities and alcohol-related

products and disguised as magnet sales; or  (iii) proceeds from

stock transactions funneled through shell companies set up by

closely-related third parties at the direction of defendant

FISHERMAN and his associates to give the appearance of

legitimate sales;

(2)     payments of money by YBM or its subsidiaries that were falsely

described as payments to vendors for raw materials, equipment,

technology and services related to magnet production.  In reality,

the payments were either: (i) non-existent; (ii) directed to the

benefit of defendants MOGILEVICH, FISHERMAN, BOGATIN

and TSOURA, or to closely-related parties and associates of the

defendants; (iii) made to bona fide vendors in Europe for non-

magnet purchases such as food commodities, cigarettes, alcohol, or

other materials for alcohol production; or (iv) were proceeds from

stock transactions funneled through shell companies set up by

closely related third parties and disguised as payments to vendors;

and

(3)     payments by YBM and its subsidiaries of "magnet sales commissions" which, in reality, either: (i) were never made; or (ii) were disguised  payments to close associates of defendants MOGILEVICH, BOGATIN, FISHERMAN, and TSOURA.

(d)     Defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA, in order to make YBM look profitable and attractive to investors, at various times between 1994 and 1998,  further falsified or caused YBM's books and records to be falsified by, among other things:

(1)      creating false financial records, bank statements, invoices, contracts, customer  lists, shipping documentation and audit confirmations, to support false claims of sales activity and revenues;

(2)     disguising the fact that approximately $32 million had been falsely reported on the books and records of UNITED TRADE and deposited in a UNITED TRADE bank account for the year ended December 31, 1997, and covering up the falsification by orchestrating a sell-off of YBM stock by the defendants and their nominees in early 1998, and then moving the proceeds into bank accounts to create the appearance that the $32 million existed on the books when it did not;

(3)     moving funds in a circular flow to and from bank accounts of UNITED TRADE, using bank accounts under the control of related parties in Russia and Eastern Europe to create the illusion that

UNITED TRADE had a diverse customer and vendor base and conducted significant activity, including brokering of magnets, which was untrue;

(4)     destroying wire transfers and other documents that would otherwise  track the flow of money through YBM bank accounts;

(5)     funneling proceeds generated from the sale of YBM stock to closely related parties and entities to create the false appearance of commercial transactions on YBM's books and records;

(6)     routinely using cash withdrawals from bank accounts set up in foreign banks to make millions of dollars in disbursements to the defendants and other closely-related parties for purported business expenses that could not be traced or verified through the books and records; and

(7)     routinely and systematically failing to make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and disposition of the assets of YBM, as required under the Securities Exchange Act of 1934, §13(b)(2)(A), under securities regulations in Canada, and in accordance with generally accepted accounting principles.

**E.     MISREPRESENTATIONS OF YBM's OPERATIONS AND FINANCIAL CONDITION TO SECURITIES REGULATORS AND INVESTMENT COMMUNITY**

36.     Defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA, in order to make YBM look profitable and attractive to investors, made the following material misrepresentations to the securities regulators and to the investment community regarding YBM's operation and financial condition in public filings with securities regulators, and through the methods set forth below in paragraph 38.  It was materially misrepresented at various times between 1994 and September of 1998 that:

**Core Business**

(a)   YBM Magnex had an established track record of profitably selling high energy permanent industrial magnets, which it manufactured and distributed throughout Europe, the United States and Canada from 1992 through 1994.

•       In reality, the defendants knew YBM had no such history of significant magnet sales in the global market, including Europe, the United States and Canada; and further, knew that YBM MAGNEX's predecessor and subsidiary, ARIGON, was a European commodities trader, with a financial history involving commodities, alcohol and food products, not industrial magnets;

**Operations**

(b)  The magnet manufacturing plant in Budapest, Hungary had been operational since 1992.

•       In reality, the defendants knew the MAGNEX RT manufacturing plant was not operational until at least August 1994 when some magnet manufacturing commenced and, furthermore, knew it  was only marginally

productive between September and December of 1994;

(c)   YBM maintained a sales office and staff in Canada which promoted and sold

millions of dollars of its magnet products.

• In reality, the defendant BOGATIN and an unindicted conspirator set up a

sham sales office in Canada in or about January 1995 to foster the illusion

that YBM maintained a viable customer base in Canada, when it did not.

**Sales**

(d)   YBM MAGNEX's net magnet sales totalled approximately $110 million for

the years 1992, 1993, 1994, and through September 1995.

• In reality, the defendants knew that the books and records were "cooked,"

that  is,  the financial statements for those years contained bogus sales and

inventory figures in order to create the false appearance that YBM had a

viable customer base with significant sales of its magnet products;

(e)   Sales of YBM magnets in Canada between 1992 and May 1994 amounted to

$4.2 million (U.S.).

• In reality, the defendants knew sales of YBM magnets in Canada during

that period were virtually nonexistent and the valuation of the distribution

rights to sell YBM products in Canada based upon these bogus sales

figures was artificially inflated;

(f)   YBM had penetrated the North American magnet market, primarily in the

United States, and sales revenues from North American customers were approximately

$13.6 million in 1996.

25

• In reality, the defendants knew YBM's North American magnet sales were less than $1.8 million in 1996; magnet imports into Canada, the United States and Mexico from the Budapest manufacturing plant were negligible; and the companies identified to regulators as North American customers were: (i) companies that purportedly did business in Russia and Eastern Europe that merely maintained registered addresses in the United States; (ii) legitimate United States companies that never purchased magnets from YBM; or (iii) sham customers;

(g)  Revenues totaled approximately $100 million between 1996 and June 1998, primarily from YBM's magnet and oil sales through its subsidiary UNITED TRADE LIMITED.

• In reality, the defendants knew such revenues did not exist and were falsely recorded on YBM's books to make the company look profitable.

**Assets**

(h)  The value of the start-up machinery and equipment as reported in YBM's financial statements included Russian machinery and equipment contributed to ARIGON for the Budapest manufacturing plant in or about 1992, valued at approximately $14.5 million (USD).

• In reality, the defendants knew this value was based upon false and fraudulent documentation.

(i)  The depreciated value of machinery and equipment at the Budapest, Hungary plant as of December 31, 1997 was reported on the books and records of

UNITED TRADE and MAGNEX RT to be approximately $40 million.

- In reality, the defendants knew this was a false and inflated value, and indeed the value of the machinery and equipment at the Budapest plant as of May 1999  was not more than approximately $3,080,000;

(j)     YBM sold ARBAT, a Russian joint venture company and a subsidiary of ARIGON, for the sum of $250,000, and realized a profit of $70,000.

- In reality, the defendants knew YBM did not realize a profit, rather the purchase was paid for with monies funneled to closely-related straw parties from Mogilevich's ARIGON bank account and from monies from the sale of MOGILEVICH's YBM stock.

**Management and Control**

(k)  YBM's core operations, including production, sales, marketing and corporate finance, were primarily directed and controlled by a North American-based Board of Directors and corporate management team.

- In reality, the defendants knew the core operations were directed and controlled by the defendants MOGILEVICH, FISHERMAN and TSOURA from Budapest, Hungary, and other locations in combination with BOGATIN; and

(l)     Certain individuals held various titles and positions of authority for companies within the Network of YBM companies, including Treasurer, Sales and Marketing Director, and Director of Industrial Relations.

- In reality, the defendants knew these individuals performed minimal

27

functions for the various corporations, were placed in the Network of

YBM Companies by MOGILEVICH as "window dressing" for the public,

and took directions from MOGILEVICH to move money to and from the

corporate accounts of ARIGON, UNITED TRADE and TDL .

F.   **FAILURE TO DISCLOSE TO SECURITIES REGULATORS**

37.   The defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA

failed to disclose the following material matters, among others, in public filings with securities

regulators :

(a)   Defendant MOGILEVICH controlled YBM through his control

over YBM management;

(b)   MOGILEVICH owned  in excess of 10% of the shares of

PRATECS  and YBM stock from between approximately April 1994 and approximately

January 1998.  This was concealed by creating false documentation to show that others

owned a percentage of MOGILEVICH's stock when in fact the other persons were merely

nominees for MOGILEVICH;

(c)   Fairfax Group Ltd ("Fairfax"), an international, forensic

investigative security firm conducted an investigation of YBM and presented investigative

findings to the YBM directors and management, including defendants FISHERMAN and

BOGATIN, in or about March 1997 that:

(1)   the ARIGON  shareholders, including defendant

MOGILEVICH,  were  members of a Russian organized

crime syndicate, and owned or controlled YBM subsidiaries,

28

ARBAT, ARIGON, and MAGNEX RT;

(2)     equipment sold by the original ARIGON shareholders,

including defendant MOGILEVICH,  to MAGNEX RT was

overvalued and the records documenting the transactions

false; and

(3)     YBM was doing business with companies that did not exist,

were shell companies, and were controlled by closely related

parties to the defendants.

**G.     DISSEMINATING FALSE AND MISLEADING INFORMATION TO THE INVESTMENT COMMUNITY**

38.     The defendants MOGILEVICH, FISHERMAN, BOGATIN and TSOURA

created market demand for YBM stock and artificially inflated the price of such stock through the

dissemination of false and misleading information to the investment community.   The false and

misleading information was disseminated by the defendants in various ways, including:

(a)     the creation and issuance of annual and other periodic reports filed

with the securities regulators and available to the public to falsely tout the business

successes of YBM, including false representations about YBM's sales and profitability

contained in these reports;

(b)     the issuance of press releases that contained false and misleading

information about the business activity and financial performance of the YBM Network of

companies; and

(c)     making shareholder presentations, lobbying stockbrokers and

29

communicating with market analysts to tout record profits in revenues from magnet sales,

and global operations, which were false and fraudulent.

## H.    SALES OF SECURITIES BY PRATECS/YBM

39.    As a result of the material omissions set forth in paragraph 37(a) and (b)

above, the defendants caused Canadian regulators (ASE and ASC) on or about July 27, 1994, to

approve the sale of 4,000,000 shares of PRATECS at $0.10 (CDN) per share in an Initial Public

Offering. This sale of stock generated approximately $400,000 (CDN), which was used to fund

and promote the fraudulent operations of the company, including payments for consultant fees to

certain unindicted coconspirators.

40.    As a result of the false, fraudulent, and deceptive practices set forth in

paragraph 35 and the misrepresentations and omissions set forth in paragraphs 36 and 37, the

defendants caused Canadian regulators to approve the sale of securities by the public company,

YBM, as follows:

(a)    In or about October 1995, 7,075,000 Special Warrants, that is, securities

permitting the owners of the Warrants to convert them to shares of YBM common stock,

were sold to the public generating approximately $14.15 million (CDN) in proceeds,

which monies were used by the defendants to: (a) continue to fund the fraudulent

operations of the Network of YBM companies, including payments to defendant

BOGATIN, and others known and unknown to the grand jury; and (b) make payments to

FISHERMAN through a third party nominee account in Russia as well as payments to

individuals and companies associated with defendants MOGILEVICH, FISHERMAN and

BOGATIN.

(b)      On or about November 20, 1997, approval was obtained from the OSC to register for sale approximately 7.2 million common shares to the investing public which raised approximately $100 million (CDN) in proceeds ("1997 Offering").  The $100 million raised was used to fund and promote the fraudulent operations of the company and to carry out the scheme to defraud.  This stock was sold in two stages, as follows:

(1)      3.2 million shares of YBM stock were sold to the public for $16.50 (CDN) share in a public offering approved by the OSC and completed on November 26, 1997, which generated approximately $52 million (CDN); and

(2)      4 million shares of YBM stock, at $12 (CDN) per share, were issued in connection with a private placement of convertible notes on or about August 20, 1997, which were purchased primarily by institutional investors.  This raised approximately $48 million (CDN).  The notes were convertible into the 4 million shares of YBM common stock on November 20, 1997.

41.      From approximately July 1994, when PRATECS stock was sold  in the IPO at $.10 (CDN) per share, until approximately March 1998, when PRATECS/YBM's stock reached a peak of $20.15 (CDN) per share, the price of stock rose approximately 2,000 percent in less than four years.  On May 13, 1998, when the trading in YBM stock was suspended by the OSC, the stock was trading at approximately $14.35 (CDN) per share.

I.      **EFFORT TO EXPLOIT THE UNITED STATES SECURITIES MARKETS**

42.      In furtherance of the scheme to defraud, defendants MOGILEVICH,

31

FISHERMAN, BOGATIN and TSOURA and others known and unknown to the grand jury, took steps to have YBM's securities registered for trading with securities regulators in the United States and listed on securities exchanges inside the United States in order to further exploit the financial markets in the United States which offered greater access to investors. In this regard they caused the following to be filed:

(a)    On or about August 14, 1996, Registration Statement (Form 40-F) was filed with the SEC to register YBM securities for sale in the United States pursuant to Section 12(g) of the Securities Exchange Act of 1934, and an Application for Public Securities ("NASDAQ Application") was filed with the NASDAQ to obtain approval for a listing of YBM's stock on the NASDAQ. The Form 40-F was available to the public. As part of the filings of the Form 40-F and the NASDAQ Application, the defendants incorporated and included, and caused to be incorporated and included, the false and fraudulent representations submitted to the OSC and TSE regarding the financial condition of the Network of YBM companies, its business operations and ownership and control of YBM stock as set forth in paragraphs 36 and 37 above.

(b)    On or about November 27, 1996 and December 19, 1997, Forms 6-K (Reports of Foreign Issuer) were filed with the SEC, which Reports were available to the investing public. The Reports contained false and fraudulent representations of financial condition and business operations including filings that falsely inflated sales revenues and customer base, as set forth in paragraphs 36 and 37 above.

**J.    PROFITS TO DEFENDANTS FROM SCHEME TO DEFRAUD**

**<u>Sale of YBM stock</u>**

43.     At various times during the scheme to defraud the defendants sold large amounts of YBM stock in order to profit from the scheme to defraud described herein.  The defendants and their nominees received in excess of $25 million in stock proceeds over the life of the conspiracy.

44.     Beginning in or about May 1994, defendants MOGILEVICH, FISHERMAN, and BOGATIN established and used accounts at different brokerage firms in their names and in the names of nominees, including "investment club" accounts described below. These accounts were depositories for millions of shares of YBM stock.  These accounts enabled defendants MOGILEVICH, FISHERMAN and BOGATIN to coordinate and control the distribution, transfer and sales of large blocks of YBM stock and to profit unjustly from the sale of fraudulently inflated stock.  The proceeds from these sales were disbursed to the defendants, to their associates, and to shell companies set up and controlled, directly and indirectly, by defendants MOGILEVICH and FISHERMAN.

**Investment Clubs**

45.     The following investment clubs served as depositories for some of the stock sold for the benefit of defendants MOGILEVICH, FISHERMAN and BOGATIN, generating proceeds in excess of $15 million:

(a)     The Anix Investment Club ("Anix") was established at First Canada Securities in or about May 1994.  In 1996, the Anix account was transferred to a series of brokerage firms in the United States.  Proceeds derived from the sales of YBM stock through Anix totaled in excess of $1.5 million and were concealed by depositing monies in a foreign bank account in the names of nominees closely associated with defendants MOGILEVICH and

FISHERMAN.

(b)     The Arion Investment Club ("Arion") was established at First Marathon Securities in or about May 1996.  Proceeds derived from the sales of YBM stock through Arion totaled approximately $12 million, which monies were concealed in foreign bank accounts held in the name of an unindicted co-conspirator, a close associate of defendant MOGILEVICH.

(c)     In or about March 1996, defendant BOGATIN, at the direction and with the assistance of defendants MOGILEVICH and FISHERMAN, opened approximately 48 brokerage accounts at Dean Witter Reynolds located in the Eastern District of Pennsylvania ("Dean Witter Accounts") over which BOGATIN held power of attorney.  One of these accounts was called the Poseidon Investment Club ("PIC"), a stock investment club which traded exclusively YBM stock.  There were approximately 30 members of PIC, the membership of which was limited to defendants MOGILEVICH and FISHERMAN, the ARIGON shareholders, and nominees controlled by the defendants.  Through his power of attorney, defendant BOGATIN managed and coordinated the trading in the Dean Witter accounts on behalf of himself,  the other defendants MOGILEVICH, FISHERMAN, and TSOURA, and their nominees.  Proceeds derived from the sales of YBM stock through the Dean Witter accounts totaled approximately $1.9 million.

**Salaries and other compensation**

46.     In addition to the millions of dollars of stock profits the defendants took from YBM,  the following defendants further benefitted from the scheme to defraud described herein, by taking  salary, bonuses and other compensation totaling the approximate amounts

listed:

|  | **Defendant** | **Amount** |
|------|------------|------------|
| (a) | FISHERMAN | $ 1.3 million |
| (b) | BOGATIN | $   1 million |
| (c) | TSOURA | $  1.2 million |

<u>**COUNT ONE**</u>
**(RICO Conspiracy)**

**THE GRAND JURY CHARGES:**

1.    Paragraphs 1 through 46 of the Introduction to this Superseding Indictment

are incorporated by reference herein.

**THE ENTERPRISE**

2.    The Enterprise, also referenced herein as the "Mogilevich Enterprise,"  was

an enterprise as defined in Title 18, United States Code, Section 1961(4), namely, a group of

individuals and corporations associated in fact, which was engaged in, and the activities of which

affected, interstate and foreign commerce, and which consisted of the following individuals and

legal entities, namely:

(a)    **Individuals:**  Defendants SEMION MOGILEVICH, IGOR

FISHERMAN,  JACOB BOGATIN,  ANATOLY TSOURA, and other

individuals known to the grand jury; and

(b)    **Legal Entities:**  YBM MAGNEX INTERNATIONAL, INC., its

predecessor company, PRATECS, and its subsidiary and related

companies, ARIGON, UNITED TRADE, MAGNEX RT, ARBAT, YBM

TECHNOLOGIES, YBM MAGNEX, TDL, ORIGON, and BEM.

3.    The Mogilevich Enterprise constituted an ongoing organization whose

members functioned as a continuing unit for a common purpose of achieving the objectives of the

Enterprise.  The Mogilevich Enterprise existed for the purposes of:  (a) defrauding investors in the

United States, Canada, and elsewhere, through fraudulent schemes and material

misrepresentations and omissions, in order to obtain money and property;  (b)  receiving, holding

and investing money received from these fraudulent schemes;  (c)  disguising and concealing the

defendants' interest in, and control over the money and investments; and (d) spending and using

various amounts of money in ways that promoted the scheme and benefitted the individual

members and associates of the Mogilevich Enterprise.

        4.    Defendants SEMION MOGILEVICH, IGOR FISHERMAN, and JACOB

BOGATIN were leaders of the Mogilevich Enterprise who directed other members of the

Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the

Enterprise's affairs.  Under the direction of the leaders of the Mogilevich Enterprise, defendant

ANATOLY TSOURA, and others known to the grand jury,  participated in unlawful activities in

furtherance of the conduct of the Enterprise's affairs.

### THE RICO CONSPIRACY

        5.    From in or about 1993, continuously thereafter up to and

including in or about September 1998, in the Eastern District of Pennsylvania and elsewhere,

defendants

**SEMION MOGILEVICH,**
        **a/k/a "Simeon Mogilevitch"**
        **a/k/a "Semjon Mogilevcs"**
        **a/k/a "Shimon Makhelwitsch"**
        **a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
        **a/k/a "Yakov"**
**ANATOLY TSOURA**

being persons employed by and associated with the Mogilevich Enterprise described above in

paragraphs 2 through 4 of Count One, an enterprise which was engaged in, and the activities of

which affected, interstate and foreign commerce, did unlawfully, willfully, and knowingly

conspire and agree together and with other persons known and unknown to the grand jury, to

violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly

and indirectly, in the conduct of the affairs of the Mogilevich Enterprise through a pattern of

racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and

(5).

6.    The pattern of racketeering activity consisted of multiple acts indictable

as felony crimes under the following laws of the United States:

(a)    Title 18, United States Code, Section 1343 (Wire Fraud);

(b)    Title 18, United States Code, Section 1341 (Mail Fraud);

(c)    Title 15, United States Code, Sections 78j(b) & 78ff(a) and 17 C.F.R.

Section 240.10b-5 (Securities Fraud);

(d)    Title 18, United States Code, Section 1956(h) (Money Laundering

Conspiracy), and

(e)    Title 18, United States Code, Section 1956(a)(2) (Money Laundering).

7.    It was a further part of the conspiracy that each defendant agreed that a

coconspirator would commit at least two acts of racketeering activity in the conduct of the affairs

of the Enterprise.

**MANNER AND MEANS**

8.    Among the manner and means by which the defendants, and others,

conducted and participated in the affairs of the Mogilevich Enterprise, and accomplished and

attempted to accomplish the objectives of the conspiracy, were the following:

38

### The Scheme To Defraud

9.     The defendants devised and intended to devise the scheme as set forth in Paragraphs 1 through 46 of the Introduction to this Superseding Indictment.

### Wire Transmissions

10.     The defendants and others known and unknown to the grand jury, for the purpose of executing the scheme to defraud, caused the interstate and foreign transmission of writings, signs, signals and sounds, to and from the Eastern District of Pennsylvania, as follows:

(a)     The defendants caused correspondence and documents to be transmitted via facsimile, to and from various places in the United States, from and to various places in foreign countries, including the United Kingdom, Canada, Hungary and Russia, among others.  The documents included, but were not limited to, materially false and fictitious audit confirmations, press releases and statements of YBM's financial condition and business operation.

(b)     The defendants communicated between and among themselves and others, by telephone and cellular phone, including calls made to and from various places in the United States, and foreign countries, including Canada and Hungary; and

(c)     The defendants caused funds to be distributed between and among themselves and other individuals and entities, via wire transfers to and from bank accounts and brokerage accounts maintained in the United States, Canada, the United Kingdom, Hungary and elsewhere.  These funds were used by the defendants for the following, among other things:    (i) the

39

payment of expenses associated with the operation of the scheme; (ii) the

purchase of large blocks of PRATECS/YBM stock, by the defendants and

others, to insure a controlling interest in YBM and to profit from the sale

of YBM stock; and (iii) the creation of the false and fraudulent appearance

of commercial activity on YBM's books and records.

### Mailings

11.     The defendants, and others known and unknown to the grand jury, for the

purpose of executing the scheme to defraud caused, and attempted to cause, certain matters and

things to be sent and delivered, to and from the Eastern District of Pennsylvania, by the United

States Postal Service and by private and commercial interstate carriers. These items included, but

were not limited to, materially false and fictitious statements of YBM's financial condition and

business operations, audit confirmations, correspondence and filings with the ASC, ASE, OSC,

TSE, SEC and NASDAQ.


### Securities Transactions
#### (Fraud in Connection with the Purchase and Sale of YBM Securities)

12.     The defendants, and others known and unknown to the grand jury,

unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate

commerce and of the mails, directly and indirectly, in connection with the purchase and sale of

YBM securities:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts and omitted to state material facts

necessary in order to make the statements made, in the light of the

40

circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices and courses of business which operated and

would operate as a fraud and deceit upon a person, in connection with the

purchase and sale of shares of PRATECS/YBM by the investing public.

13.     The defendants caused YBM's financial condition and business operations
to be materially misrepresented in YBM's annual reports, prospectuses, press releases and public
filings, to present a false appearance to investors and securities regulators that YBM was a
profitable and investment-worthy business which generated high revenues from the worldwide sale
and distribution of its magnets and other products.  The defendants also failed to disclose the true
extent of MOGILEVICH's ownership and control of YBM.

### Financial Transactions

14.     The defendants and others known and unknown to the grand jury caused
monetary instruments and funds to be transported, transmitted, and transferred from places in the
United States to and through places outside of the United States, and to places in the United States
from and through places outside the United States, with the intent to:

(a)     promote the scheme to defraud through the payment of salaries, consulting

fees, commissions, mortgage, rent, advertising fees, and other expenses

necessary to support YBM's continued operation of the scheme; and

(b)     conceal and disguise the nature, location, source, ownership and control of

the proceeds generated by the scheme to defraud through the use of foreign

bank accounts, and accounts held in the names of nominees, closely-related

parties and shell companies.

15.    Portions of the proceeds generated by the three offerings of PRATECS/YBM stock, as more particularly described in the Introduction to this Superseding Indictment, were utilized to further promote the scheme to defraud.

16.    Portions of the proceeds from the sale of artificially inflated YBM stock by the defendants and their nominees were misrepresented on the books and records of YBM as revenue from its commercial operations.   Similarly, proceeds that were transferred to individual defendants and closely-related entities were concealed on the books and records of YBM as vendor payments or the repayment of loans.

## OVERT ACTS

17.    In furtherance of the conspiracy and in order to carry out the objectives of the conspiracy, on or about the dates listed below, the defendants and others known and unknown to the grand jury, committed and caused to be committed overt acts, which also constitute racketeering acts, including but not limited to the following, in the Eastern District of Pennsylvania, and elsewhere:

### Wire Transmissions

| Overt Act | Date | Description |
| --- | --- | --- |
| 1 | 1/11/93 | Facsimile of correspondence from BOGATIN's residence, Richboro, PA (ph# 215-953-1080) to FISHERMAN in Budapest, Hungary, (ph# 011-36-1-183-1450) requesting $100,000 to start up company and commence operations. |

| Overt Act | Date | Description |
| --- | --- | --- |
| 2 | 2/24/93 | Two wire transfers from ARIGON'S account at Royal |

|   |   | Bank of Scotland, London, England (a/c BLAARI-USDC) to two accounts at CoreStates Bank, Philadelphia, Pennsylvania; one for $70,000 to the YBM TECHNOLOGIES' account (a/c 0197-5336), and the second for $30,000 to BOGATIN's account (a/c 0404-8829). |
|---|---|---|
| 3 | 12/29/93 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-277-8844), providing update on the status of formation of public company. |
| 4 | 1/4/94 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-277-8844), requesting transfer of money for costs related to preparation for public company. |
| 5 | 1/12/94 | Wire transfer of $50,000 from ARIGON'S account at Royal Bank of Scotland, London, England, (a/c BLAARI-USDC) to YBM TECHNOLOGIES account at CoreStates Bank, Philadelphia, PA (a/c 0197-5336). |
| 6 | 3/17/94 | Wire transfer of $50,000 from ARIGON'S account at Royal Bank of Scotland, London, England, (a/c BLAARI-USDC) to BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829),  for purchase of stock. |
| 7 | 3/21/94 | Wire transfer of $50,000 from BOGATIN's account at CoreStates Bank, Philadelphia, PA, (a/c 0404-8829)  to account of Cook Snowden at Royal Bank of Canada, Calgary, Canada (a/c 1321579). |
| 8 | 7/20/94 | Facsimile of correspondence from BOGATIN, in Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-277-8844), regarding Pratecs stock prices and requesting $200,000 to $250,000 to redeem 1 million shares, and an additional $50,000 to purchase shares. |

| **Overt Act** | **Date** | **Description** |
|---|---|---|

| | | |
|---|---|---|
| 9 | 7/22/94 | Wire transfer of $200,000 from ARIGON'S account at Royal Bank Of Scotland, London, England (a/c BLAARI-USDC) to BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829). |
| 10 | 7/25/94 | Wire transfer of $150,000 from BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829) to an Anix Investment Club account at Canadian Imperial Bank of Commerce, Toronto, Canada (a/c 49-0068-4). |
| 11 | 3/29/95 | Facsimile of correspondence from an unindicted coconspirator in London, England (ph# 44-0171-242-0726) to Parente, Media, PA (ph# 610-891-0463), providing the auditor with information regarding other purported beneficial owners of ARIGON stock. |
| 12 | 4/17/95 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN, Budapest, Hungary (ph# 011-36-1-342-0758) advising them of expenses incurred. |
| 13 | 7/15/95 | Facsimile of correspondence from BOGATIN, Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-1-342-0758), requesting money for expenses. |
| 14 | 7/19/95 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing a false statement denying a relationship between British investigation and ARIGON. |
| 15 | 10/15/96 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re YBM's "penetration" of North American market and reporting YBM's magnet sales. |
| 16 | 12/10/96 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re YBM's "million dollar contract with Mitsubishi of Japan." |
| 17 | 1/26/97 | Fascimile of false audit confirmation to FE & CE Co., Inc., Buffalo, New York (ph # 716-847-0814) from MAGNEX RT, Budapest, Hungary (ph # 36-1-276-4521) re $5.6 million in sales. |

| Overt Act | Date | Description |
|---|---|---|

| 18 | 1/26/97 | Facsimile of false audit confirmation to BIG Enterprises, Inc., Buffalo, New York (ph # 716-847-0814) from MAGNEX RT, Budapest, Hungary (ph # 36-1-276-4521) re $2.3 million in sales. |
| 19 | 2/25/97 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re YBM's continued "penetration" of North American market and reporting magnet sales figures. |
| 20 | 5/14/97 | Facsimile from FISHERMAN and TSOURA, Budapest, Hungary (ph# 36-1-277-8121) to YBM  MAGNEX, Newtown, PA (ph# 215-579-3444) containing April 1997 financial information for UNITED TRADE. |
| 21 | 5/28/97 | Facsimile from TSOURA, Budapest, Hungary, (ph#  36-1-277-8121) to YBM MAGNEX, Newtown, PA (ph# 215-589-3444) containing responses to questions about the April 1997 financial information for UNITED TRADE. |
| 22 | 7/2/97 | Facsimile of false "sales" audit confirmation from Kofa, Ltd. (ph# 095-938-2039) in Russia, to Deloitte in EDPA (ph# 215-448-2236), re $1.37 million in sales. |
| 23 | 7/3/97 | Facsimile of  false "sales" audit confirmation from Amadeus Holding Ltd. in Canada (ph # 403-483-4064) to Deloitte in EDPA (ph# 215-448-2236), re $2.8 million in sales. |
| 24 | 7/3/97 | Facsimile of  false "sales" audit confirmation from BIG Enterprises, Inc., in Moscow, Russia (ph# 7-502-221-4546) to Deloitte in EDPA (ph# 215-448-2236) re $2.3 million in sales. |
| 25 | 7/31/97 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing false information re the sale of CatchDisk computer security system for $4.5 million, a 200% profit. |
| 26 | 8/29/97 | Facsimile from TSOURA, Budapest, Hungary (ph# 36-1-277-8121), to YBM MAGNEX, Newtown, PA (ph# 215-579-3444), containing responses to questions about the July 1997 financial information for UNITED TRADE. |

| Overt Act | Date | Description |
| --- | --- | --- |

| 27 | 11/5/97 | Facsimile from TSOURA, Budapest, Hungary, (ph# 36-1-277-8121) to YBM MAGNEX, Newtown, PA (ph# 215-579-3444) containing information about the January to September 1997 financial information for UNITED TRADE. |
|---|---|---|
| 28 | 1/30/98 | Facsimile of false "sales" audit confirmation from Amadeus Holding Ltd., Canada (ph # 403-483-4064) to Deloitte in EDPA (ph# 215-448-2236), re $3.1 million in sales. |
| 29 | 2/24/98 | Facsimile of false "sales" audit confirmation re $3 million, from Origon Co., in Nevis to Deloitte in EDPA (ph# 215-448-2236). |
| 30 | 3/9/98 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for 1997. |
| 31 | 3/9/98 11:52 a.m | Telephone conversation from  BOGATIN,  in Newtown, PA (ph# 215-738-3800) to  MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 36-20-339-688) discussing MOGILEVICH's continued help, his instructions re ongoing audit problems and the need for documentation. |
| 32 | 3/12/98 10:05 a.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695) and a stock broker in Toronto, Canada (ph# 416-943-6101)  discussing sale of 1.5 million shares of YBM stock, purportedly by an "ill" shareholder. |
| 33 | 3/19/98 2:27 p.m. | Telephone conversation from BOGATIN, in Newtown, PA (ph# 215-579-5695) to FISHERMAN, in Budapest, Hungary (ph# 36-20-339-688)  discussing the transfer of proceeds totaling approximately $17 million from the sale of stock. |

| Overt Act | Date | Description |
|---|---|---|
| 34 | 3/27/98 3:22 p.m. | Telephone conversation from BOGATIN in Newtown, PA |

|  |  | (ph# 215-579-5695) to  FISHERMAN, in Budapest, Hungary (ph# 36-20-339-688) discussing Russia and Ukraine licensing agreements and the use of a company named "Australian Finance Structure" to facilitate the transfer of money. |
|---|---|---|
| 35 | 4/27/98 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for the first quarter of 1998. |
| 36 | 5/1/98 11:59 a.m. | Telephone conversation from BOGATIN in Newtown, PA (ph# 215-579-5695) to  FISHERMAN, Budapest, Hungary (ph# 36-20-339-688) in which BOGATIN advises the Australian company is an obvious "sham." |
| 37 | 5/12/98 4:50pm | Telephone conversation from BOGATIN in Newtown, PA (ph# 215-579-5695) to a stockbroker in Toronto, Canada (ph# 514-848-1991) providing false assurances regarding YBM's ongoing audit and promoting YBM's financial expectations |
| 38 | 5/13/98 9:18am | Facsimile correspondence from Budapest, Hungary (ph# 36-1-277- 8121) to YBM in Newtown, PA, (ph# 215-579-4418)  providing authorization to transfer $28 million from a YBM bank account at the Royal Bank of Canada, Toronto, Canada, to an account in Budapest, Hungary. |
| 39 | 6/8/98 | Facsimile of YBM press release from EDPA to a wire service in Canada falsely stating that MOGILEVICH's involvement in YBM was only that of  a "passive shareholder." |
| 40 | 6/11/98 | Wire transfer of $200,000 from UNITED TRADE'S account at Mellon Bank, Philadelphia, PA (a/c 8-449-779) to FISHERMAN'S account at Summit Bank, Cherry Hill, NJ (a/c 642012962). |
| 41 | 8/21/98 | Facsimile of false Snoras Bank statement for United Trade account and bogus wire transfer instructions totaling approximately $32.2 million from Budapest, Hungary (ph# 36-1-277-8121) to YBM in Newtown, PA (PH# 215-579-4418). |

**Mailings**

| **Overt Act** | **Date** | **Description** |
|---|---|---|

| 42 | 3/5/95 | False "account payable" audit confirmation in the amount of $49,000 for 1994 audit year, mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 from FNJ Trade Management in Los Angeles, CA. |
| 43 | 3/5/95 | False "account receivable" audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 purportedly from Comspan in Los Angeles, CA. |
| 44 | 4/7/95 | False audit confirmations mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063: one from FNJ Trade Management in Los Angles, CA, pertaining to an "account receivable" in the amount of $699,985 for 1992 audit year; and one purportedly from Andrew Gaspar in Los Angeles, CA, pertaining to a "commission." |
| 45 | 8/13/96 | Envelope mailed from EDPA to Andrew Labadie, The NASDAQ Stock Market, 1735 K Street NW, Washington, D.C. 20006-1500, containing NASDAQ Listing Agreement, Application for Listing on NASDAQ, and copy of the Form 40-F. |
| 46 | 8/14/96 | SEC filing (Form 40-F-Registration Statement) sent via Federal Express to the United States Securities and Exchange Commission, Washington, D.C. 20549, from office of Wolf, Block, Schorr & Solis-Cohen, 111 South 15th Street, Philadelphia, PA. |
| 47 | 11/27/96 | SEC filing (Form 6-K-Report of Foreign Issuer) sent via Federal Express to the United States Securities and Exchange Commission, Washington, D.C. 20549, from the office of Wolf, Block, Schorr & Solis-Cohen, 111 South 15th Street, Philadelphia, PA. |

| Overt Act | Date | Description |
| --- | --- | --- |
| 48 | 12/19/97 | SEC filing (Form 6K-Report of Foreign Issuer) sent via Federal Express from office of Wolf, Block, Schorr & |

Solis-Cohen, 111 South 15th Street., Philadelphia, PA to
United States Securities and Exchange Commission,
Washington, DC 20549.

**Financial Transactions**
**(Promotion of the Scheme )**

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 49 | 11/2/95 | Proceeds totaling approx. $755,555 from Special Warrants Offering. | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc. a/c 2006-8360 CoreStates Bank Philadelphia, PA |
| 50 | 5/22/96 | Proceeds totaling approx. $2,072,291 from the sale of shares of YBM stock. | CBN Trust Co. a/c 24070843 Snoras Bank Lithuania | Technology Distribution Ltd. (TDL) a/c 0001-036613-500 Central-Euro. Int'l Bank Budapest, Hungary |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 51 | 6/12/96 | Six wire transfers of proceeds totaling approx. $3.2 million from the sale of shares of YBM. | Technology Dist. Ltd. (TDL) a/c 0001-036613-500 Central-European Int'l Bank Budapest, Hungary | Nominee Accounts: • IBS Trad'g Co. a/c 530-250918 ($528,884) • N.Y. Cotton Corp. a/c 530-295377 ($512,604) • United Norland Investment Corp. a/c 530-043114 ($372,500) • M. Finance Co. a/c 530-296020 ($618,410) • Independent Group, Inc. a/c 530-296047 ($580,080) • Whitley Int'l Corp. a/c 530-296489 ($587,522) Chase Manhattan Bank *(formerly Chemical Bank)* Buffalo, New York |
| 52 | 10/28/96 | Proceeds totaling approx. $150,000 in connection with the Arbat divestiture. | Unindicted Coconspirator a/c 501-01791-3101-4012 Magyar Kulkereskedelmi Bank (MKB) Budapest, Hungary | YBM Magnex Inc. a/c 14108-82581 CoreStates Bank Philadelphia, PA |
| 53 | 11/28/97 | Proceeds totaling approx. $500,000 from the 1997 Offering. | YBM Magnex International a/c 110-596-4 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc. a/c 2-953-495 Mellon Bank Philadelphia, PA |
| 54 | 1/12/98 | Proceeds totaling approx. $1,200,000 from the 1997 Offering. | YBM Magnex International a/c 110-596-4 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc. a/c 2-953-495 Mellon Bank Philadelphia, PA |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 55 | 5/26/98 | Proceeds totaling approx. $10 million from the sale of shares of YBM. | United Trade Ltd. a/c 503-20008-4100-4014 MKB Bank Budapest, Hungary | United Trade Ltd. a/c 8-449-779 Mellon Bank Philadelphia, PA |
| 56 | 6/30/98 | Approx. $1.8 million for the Russian Licensing Agreement | United Trade Ltd. a/c 402-557-3 Royal Bank of Canada Toronto, Canada | Australian Finance Structure Pty. Ltd. a/c 0738081 Latvia |

**Financial Transactions**
**(Concealment of Proceeds)**

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 57 | 11/2/95 | Approx. $976,047 | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | Pantra Trad'g Ltd. a/c 2344502 Barclays Bank Cyprus |
| 58 | 5/10/96 | Proceeds totaling approx. $65,179 from the sale of shares of YBM. | Unindicted Coconspirator a/c 52-304-F & a/c 42-304-E Griffiths McBurney Partners Toronto, Canada | Poseidon Investment Club a/c 645-101-745-02 Dean Witter Reynolds Jenkintown, PA |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 59 | 5/23/96 | Five wire transfers of proceeds, each in the approx. amount of $860,076, from the sale of shares of YBM. | Unindicted Coconspirator Griffiths McBurney Partners Toronto, Canada | Nominee Accounts: <br> • N.Y. Cotton Corp. a/c 530-295377 <br> • United Norland Investment Corp. a/c 530-043114 <br> • M. Finance Co. a/c 530-296020 <br> • Independent Group, Inc. a/c 530-296047 <br> • Whitley Int'l Corp. a/c 530-296489 <br> Chase Manhattan Bank *(formerly Chemical Bank)* Buffalo, New York |
| 60 | 8/1/96 | Approx. $100,500 | Unindicted Coconspirator a/c 501-00152-3101-4014 MKB Bank Budapest, Hungary | Olga Zhunzhurova, wife of Igor Fisherman |
| 61 | 8/14/96 | Approx. $250,000 | Poseidon Investment Club (V. Alexandroff) a/c 53-360F-0/53-360E-2 Griffiths McBurney Partners Toronto, Canada | Jefferson Gersch, Inc. a/c 2664-845 Mellon PSFS Newtown, PA |
| 62 | 9/5/96 | Three wire transfers of proceeds, totaling approx. $700,000, from the sale of shares of YBM. | Unindicted Coconspirator a/c 52-304-F/410-00104-14 Griffiths McBurney Partners Toronto, Canada | Nominee Accounts: <br> • N.Y. Cotton Corp. a/c 530-295377 ($250,000) <br> • United Norland Investment Corp. a/c 530-043114 ($250,000) <br> • M. Finance Co. a/c 530-296020 ($200,000) <br> Chase Manhattan Bank *(formerly Chemical Bank)* Buffalo, New York |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 63 | 10/7/96 | Five wire transfers of proceeds, totaling approx. $2.3 million, from the sale of shares of YBM. | Unindicted Coconspirator a/c 52-304-F/410-00104-14 Griffiths McBurney Partners Toronto, Canada | Nominee Accounts: <br> • N.Y. Cotton Corp. a/c 530-295377 ($500,000) <br> • United Norland Investment Corp. a/c 530-043114 ($500,000) <br> • Independent Group, Inc. a/c 530-296047 ($500,000) <br> • Whitley Int'l Corp. a/c 530-296489 ($300,000) <br> • M. Finance Co. a/c 530-296020 ($500,000) <br> Chase Manhattan Bank *(formerly Chemical Bank)* Buffalo, New York |
| 64 | 12/11/96 | Proceeds totaling approx. $301,797. | Poseidon Investment Club a/c 45-101-745-021 Dean Witter Reynolds Jenkintown, PA | YBM Magnex, Inc. a/c 1410882581 CoreStates Bank Philadelphia, PA |
| 65 | 12/19/96 | Proceeds totaling approx. $100,000 from the sale of shares of YBM. | Jacob Bogatin a/c 310200-639200 Barclays Bank Cayman Islands | Jacob Bogatin a/c 0404-8829 CoreStates Bank Philadelphia, PA |
| 66 | 2/4/97 | Proceeds totaling approx. $7.3 million from the sale of shares of YBM. | Arion Club accounts a/c 025285A (CDN) & a/c 025285B (USD) First Marathon Securities Toronto, Canada | Unindicted Coconspirator a/c 501-00152-3102-4013 MKB Bank Budapest, Hungary |
| 67 | 2/10/97 | Proceeds totaling approx. $350,000 from the sale of shares of YBM. | Poseidon Investment Club (V. Alexandroff) a/c 410-00272-10 Griffiths McBurney Partners Toronto, Canada | Jefferson Gersch, Inc. a/c 2664-845 Mellon PSFS Newtown, PA |

| Overt Act | Date | Description | Transferred from | Transferred to |
|---|---|---|---|---|
| 68 | 4/8/97 | Proceeds totaling approx. $670,000 from the sale of shares of YBM. | Nominee Accounts:<br>• Galina Polouchina a/c 7AM 184173 ($410,000)<br>• Victor Soutchkov a/c 7AM 184371 ($260,000) | Unindicted Coconspirator a/c 501-00152-3101-4014<br>MKB Bank<br>Budapest, Hungary |
| 69 | 9/11/97 | Proceeds totaling approx. $620,934 from the sale of shares of YBM. | YBM Magnex Inc. a/c 2-953-495 Mellon Bank Philadelphia, PA | Nominee account: Nadeja Polichtchuk a/c 503-20854-3100-4016<br>MKB Bank<br>Budapest, Hungary |
| 70 | 2/9/98 | Proceeds totaling approx. $1.9 million from the sale of shares of YBM. | Nominee account: Sandorne Bodonyi a/c 410-00259-25 Griffiths McBurney Partners Toronto, Canada | Nominee account: Sandorne Bodonyi/Andrew Gaspar a/c 23616-06087 Bank of America North Hollywood, CA |
| 71 | 9/7/98 | Proceeds totaling approx. $459,700 from the sale of shares of YBM. | Nominee account: Irina Gruber a/c Z-11-055492 Fidelity Investments New York, N.Y. | Nominee account: Irina Gruber a/c 503-20831-3100-4015<br>MKB Bank<br>Budapest, Hungary |

All in violation of Title 18, United States Code, Section 1962(d).

## COUNTS TWO THROUGH TWENTY-THREE
### (Wire Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

      2.      On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
      **a/k/a "Simeon Mogilevitch"**
      **a/k/a "Semjon Mogilevcs"**
      **a/k/a "Shimon Makhelwitsch"**
      **a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
      **a/k/a "Yakov"**
**ANATOLY TSOURA**

and others known and unknown to the grand jury, having devised a scheme and artifice to defraud and to obtain money and property by materially false and fraudulent pretenses, representations and promises, as described in the Introduction to this Superseding Indictment, and for the purpose of executing the scheme and artifice to defraud, and attempting to do so, caused to be transmitted in interstate commerce, and aided and abetted the transmission, to and from the Eastern District of Pennsylvania, by means of wire communications, certain writings, signs, signals, pictures and sounds, as set forth below, in violation of Title 18, United States Code, Section 1343, each transmission constituting a separate count of the Superseding Indictment to and from the Eastern District of Pennsylvania:

| Count | Date | Description | Defendants |
|---|---|---|---|
| 2 | 7/20/94 | Facsimile of correspondence from BOGATIN, in Hatboro, PA (ph# 215-956-9224) to MOGILEVICH and FISHERMAN, in Budapest, Hungary (ph# 011-36-1-277-8844) regarding Pratecs stock prices and requesting $200,000 to $250,000 to redeem 1 million shares, and an additional $50,000 to purchase shares. | MOGILEVICH FISHERMAN BOGATIN |
| 3 | 7/22/94 | Wire transfer of $200,000 from ARIGON'S account at Royal Bank of Scotland, London, England (a/c BLAARI-USDC) to BOGATIN's account at CoreStates Bank, Philadelphia, PA (a/c 0404-8829) | MOGILEVICH FISHERMAN BOGATIN |
| 4 | 7/25/94 | Wire transfer of $150,000 from BOGATIN's account at CoreStates Bank, Phila., PA (a/c 0404-8829)  to an Anix Investment Club account at Canadian Imperial Bank of Commerce, Toronto, Canada (a/c 49-0068-4) . | MOGILEVICH FISHERMAN BOGATIN |
| 5 | 3/29/95 | Facsimile of correspondence from an unindicted coconspirator in London, England (ph# 44 0171-242-0726) to Parente, in Media, PA (ph# 610-891-0463), providing the auditor with information regarding other purported beneficial owners of ARIGON stock. | MOGILEVICH FISHERMAN BOGATIN |
| 6 | 5/14/97 | Facsimile from FISHERMAN and TSOURA, Budapest, Hungary (ph# 36-1-277-8121) to YBM Magnex, Newtown, PA (ph# 215-579-3444) containing April 1997 financial information for UNITED TRADE. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 7 | 5/28/97 | Facsimile from TSOURA, Budapest, Hungary, (ph# 36-1-277-8121) to YBM MAGNEX, Newtown, PA (ph# 215-579-3444) containing responses to questions about the April 1997 financial information for UNITED TRADE. | MOGILEVICH FISHERMAN BOGATIN TSOURA |

| 8 | 7/2/97 | Facsimile of false "sales" audit confirmation from Kofa, Ltd., in Russia (ph# 095-938-2039) to Deloitte, in EDPA, (ph# 215-448-2236) re $1.37 million in sales. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 9 | 7/3/97 | Facsimile of  false "sales" audit confirmation from: Amadeus Holding Ltd., in Ontario, Canada (ph# 403-483-4064)  to Deloitte, in EDPA (ph# 215-448-2236) re $2.8 million in sales. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 10 | 8/29/97 | Facsimile from TSOURA, Budapest, Hungary (ph# 36-1-277-8121), to YBM MAGNEX, Newtown, PA (ph# 215-579-3444), containing responses to questions about the July 1997 financial information for UNITED TRADE. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 11 | 11/5/97 | Facsimile from TSOURA, Budapest, Hungary (ph# 36-1-277-8121), to YBM MAGNEX, Newtown, PA (ph#  215-579-3444), containing information about the January to September 1997 financial information for UNITED TRADE. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 12 | 1/30/98 | Facsimile of false "sales" audit confirmation re $3.1 million, from Amadeus Holding Ltd., in Ontario, Canada (ph# 403-483-4064) to Deloitte, in EDPA (ph# 215-448-2236). | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 13 | 2/24/98 | Facsimile of false "sales" audit confirmation re $3 million, from Origon Co., in Nevis to Deloitte, in EDPA (ph#  215-448-2236). | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 14 | 3/9/98 | Facsimile of YBM press release, from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for 1997. | MOGILEVICH FISHERMAN BOGATIN TSOURA |

| | | | |
|---|---|---|---|
| 15 | 3/9/98<br>11:52 a.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-738-3800) and MOGILEVICH and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688), discussing MOGILEVICH's continued help, his instructions re ongoing audit problems and the need for documentation. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 16 | 3/12/98<br>10:05 a.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695) and a stock broker in Toronto, Canada (ph# 416-943-6101), discussing sale of 1.5 million shares of YBM stock, purportedly by an "ill" shareholder. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 17 | 3/19/98<br>2:27 p.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695), and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688), discussing the transfer of proceeds totaling approximately $17 million from the sale of stock. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 18 | 3/27/98<br>3:22 p.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695), and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688), discussing  Russia and Ukraine licensing agreements  and the use of a company named "Australian Finance Structure" to facilitate the transfer of money. | MOGILEVICH<br>FISHERMAN<br>BOGATIN |
| 19 | 4/27/98 | Facsimile of YBM press release from EDPA to a wire service in Canada, publicizing falsely inflated figures re YBM's financial results for the first quarter of 1998. | MOGILEVICH<br>FISHERMAN<br>BOGATIN<br>TSOURA |
| 20 | 5/1/98<br>11:59 am | Telephone conversation between BOGATIN in Newtown, PA (ph# 215-579-5695), and FISHERMAN in Budapest, Hungary (ph# 011-36-20-339-688) in which BOGATIN advises the Australian company is an obvious "sham." | MOGILEVICH<br>FISHERMAN<br>BOGATIN |

| 21 | 5/12/98 4:50 p.m. | Telephone conversation between BOGATIN, in Newtown, PA (ph# 215-579-5695) and stock broker in Toronto, Canada (ph# 514-848-1991) in which BOGATIN provides false assurances regarding YBM's ongoing audit and promoting YBM's financial expectations. | MOGILEVICH FISHERMAN BOGATIN |
| 22 | 5/13/98 9:18 a.m. | Facsimile correspondence from Budapest, Hungary (ph# 36-1-277-8121), to YBM in Newtown, PA, providing authorization to transfer $28 million from a YBM bank account at the Royal Bank of Canada, Toronto, Canada to Budapest. | MOGILEVICH FISHERMAN BOGATIN |
| 23 | 6/11/98 | Wire transfer of $200,000 from UNITED TRADE'S account at Mellon Bank, Philadelphia, PA (a/c 8-449-779); to FISHERMAN'S account at Summit Bank, Cherry Hill, NJ (a/c 642012962). | MOGILEVICH FISHERMAN BOGATIN |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS TWENTY-FOUR THROUGH TWENTY-NINE
### (Mail Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

      2.      On or about the dates set forth below in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
**a/k/a "Yakov"**
**ANATOLY TSOURA**

and others known and unknown to the grand jury, having devised a scheme and artifice to defraud and to obtain money and property by materially false and fraudulent pretenses, representations and promises, as described in the Introduction to this Superseding Indictment, and for the purpose of executing the scheme and artifice to defraud, and attempting to do so, knowingly caused to be sent and delivered by mail according to the directions thereon, and aided and abetted the delivery, by the United States Postal Service and by private and commercial interstate carrier, the documents described below, in violation of Title 18, United States Code, Section 1341, each delivery constituting a separate count of the Superseding Indictment:

60

| Count | Date | Description | Defendants |
|---|---|---|---|
| 24 | 3/5/95 | False "account payable" audit confirmation in the amount of $49,000 for 1994 audit year, mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063; from FNJ Trade Management in Los Angeles, CA. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 25 | 3/5/95 | False "account receivable" audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 purportedly from Comspan in Los Angeles, CA. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 26 | 4/7/95 | False audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 from FNJ Trade Management in Los Angeles, CA, pertaining to an "account receivable" in the amount of $699,985 for 1992 audit year. | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 27 | 4/7/95 | False audit confirmation mailed to Parente Randolph Orlando and Carey, 102 Chesley Drive, Media, PA 19063 purportedly from Andrew Gaspar in Los Angeles, CA, pertaining to a "commission." | MOGILEVICH FISHERMAN BOGATIN TSOURA |
| 28 | 8/13/96 | Envelope mailed to Andrew Labadie, The NASDAQ Stock Market, 1735 K Street NW, Washington, D.C. 20006-1500, containing NASDAQ Listing Agreement, Application for Listing on NASDAQ, and copy of the Form 40-F sent to United States Securities and Exchange Commission from EDPA. | MOGILEVICH FISHERMAN BOGATIN |
| 29 | 8/14/96 | SEC filing (Form 40-F) sent via Federal Express to the United States Securities and Exchange Commission, Washington, D.C. 20549; from Office of Wolf, Block, Schorr & Solis-Cohen, 111 South 15th Street, Philadelphia, PA. | MOGILEVICH FISHERMAN BOGATIN |

All in violation of Title 18, United States Code, Sections 1341 and 2.

61

## COUNT THIRTY
**(Securities Fraud)**

**THE GRAND JURY FURTHER CHARGES:**

1.     The allegations contained in Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2.     From on or about July 27, 1994, up to and including on or about May 13, 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
    **a/k/a "Simeon Mogilevitch"**
    **a/k/a "Semjon Mogilevcs"**
    **a/k/a "Shimon Makhelwitsch"**
    **a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
    **a/k/a "Yakov"**
**ANATOLY TSOURA**

together with others known and unknown to the grand jury, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, used and employed manipulative and deceptive devices and contrivances, by

    (a)     employing devices, schemes, and artifices to defraud;

    (b)     making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    (c)     engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of  Pratecs/YBM securities by the investing public.

3.      The defendants violated those provisions by committing the acts set forth in the scheme as discussed in the Introduction to this Superseding Indictment, including, among other things, making materially false and misleading statements about YBM's core business, its financial condition, and the ownership and control of the company.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), 17 C.F.R. § 240.10b-5 and Title 18, United States Code, Section 2.

## COUNT THIRTY-ONE
**(Filing False Registration Statement with the Securities and Exchange Commission)**

**THE GRAND JURY FURTHER CHARGES:**

1.       Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by  reference herein.

2.       On or about August 14, 1996, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH
a/k/a "Simeon Mogilevitch"
a/k/a "Semjon Mogilevcs"
a/k/a "Shimon Makhelwitsch"
a/k/a "Seva"
IGOR FISHERMAN,
JACOB BOGATIN,
a/k/a "Yakov"**

willfully and knowingly caused, and aided and abetted, the filing by YBM of an SEC Form 40-F, a Registration Statement of a foreign issuer, which contained statements of material fact that were false and misleading and that failed to contain material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading, in that, among other things:  YBM materially misrepresented the nature of its business operations and financial condition, as set forth in paragraph 36 (a) through (e) and (h) through (l) in the Introduction to this Superseding Indictment; and YBM failed to disclose the true extent of MOGILEVICH's ownership and control of YBM, as set forth in paragraph 37 (a) and (b).

In violation of Title 15, United States Code, Sections 78l(g), 78ff(a) and 17 C.F.R., Section 240.12b-20, and Title 18, United States Code, Section 2.

## COUNT THIRTY-TWO
### (Filing False Report with the Securities and Exchange Commission)

**THE GRAND JURY FURTHER CHARGES:**

1.      Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2.      On or about November 27, 1996, in the Eastern District of Pennsylvania and elsewhere, defendants

> **SEMION MOGILEVICH,**
> **a/k/a "Simeon Mogilevitch"**
> **a/k/a "Semjon Mogilevcs"**
> **a/k/a "Shimon Makhelwitsch"**
> **a/k/a "Seva"**
> **IGOR FISHERMAN,**
> **JACOB BOGATIN,**
> **a/k/a "Yakov"**
> **ANATOLY TSOURA**

willfully and knowingly caused, and aided and abetted, the filing by YBM of an SEC Form 6-K (A Report of Foreign Issuer), which contained statements of material fact that were false and misleading and that failed to contain material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading, in that YBM reported, among other things, that its net sales for the nine-month period ending September 30, 1996, were approximately $64 million, which were generated primarily from its core business, the sale of magnets, when the defendants well knew that YBM's net sales were materially misrepresented as to the nature, the amount, and the geographic location of the sales

In violation of Title 15, United States Code, Sections 78m(a), 78ff(a) and 17 C.F.R., Sections 240.12b-20, 240.13a-1, 240.13a-3, 240.13a-16, and Title 18, United States Code, Section 2.

## COUNT THIRTY-THREE
### (Filing False Report with the Securities and Exchange Commission)

**THE GRAND JURY FURTHER CHARGES:**

1.     Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2.     On or about December 19, 1997, in the Eastern District of Pennsylvania and elsewhere, defendants

> **SEMION MOGILEVICH,**
> **a/k/a "Simeon Mogilevitch"**
> **a/k/a "Semjon Mogilevcs"**
> **a/k/a "Shimon Makhelwitsch"**
> **a/k/a "Seva"**
> **IGOR FISHERMAN,**
> **JACOB BOGATIN,**
> **a/k/a "Yakov"**
> **ANATOLY TSOURA**

willfully and knowingly caused, and aided and abetted, the filing by YBM of an SEC Form 6-K (A Report of Foreign Issuer), which contained statements of material fact that were false and misleading and  that failed to contain material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading, in that YBM reported, among other things, that its net sales for the nine-month period ending  September 30, 1997 to be over $93 million when the defendants well knew that YBM's net sales for the period were materially less than reported.

In violation of Title 15, United States Code, Sections 78m(a), 78ff(a) and 17 C.F.R., Sections 240.12b-20, 240.13a-1, 240.13a-3, 240.13a-16, and Title 18, United States Code, Section 2.

## COUNT THIRTY-FOUR
### (Falsification of Books and Records)

**THE GRAND JURY FURTHER CHARGES:**

1.      Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are hereby incorporated by reference herein.

2.      From in or about the Fall of 1995 through in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

> **SEMION MOGILEVICH,**
> **a/k/a "Simeon Mogilevitch"**
> **a/k/a "Semjon Mogilevcs"**
> **a/k/a "Shimon Makhelwitsch"**
> **a/k/a "Seva"**
> **IGOR FISHERMAN,**
> **JACOB BOGATIN,**
> **a/k/a "Yakov"**
> **ANATOLY TSOURA**

and others known and unknown to the grand jury, unlawfully, willfully, and knowingly, directly and indirectly, falsified and caused to be falsified books, records, and accounts which, in reasonable detail, would accurately and fairly reflect the transactions and disposition of the assets of YBM, by, among other things, providing incomplete, inconsistent, contradictory and bogus documentation to identify and support YBM's purported customer and vendor base; creating false financial records, bank statements, invoices, customer lists, shipping documentation and audit confirms; and, destroying wire transfer and other documents.

In violation of Title 15, United States Code, Sections 78m(b)(5), 78ff(a), 17 C.F.R., Section 240.13b2-1, and Title 18, United States Code, Section 2.

## COUNT THIRTY-FIVE
### (Money Laundering Conspiracy)

**THE GRAND JURY FURTHER CHARGES:**

1.       Paragraphs 1 through 46 of the Introduction to this Superseding Indictment are incorporated by reference herein.

2.       From in or about May 1994, through in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
   **a/k/a "Simeon Mogilevitch"**
   **a/k/a "Semjon Mogilevcs"**
   **a/k/a "Shimon Makhelwitsch"**
   **a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
   **a/k/a "Yakov"**

did unlawfully and knowingly conspire and agree together and with other persons known and unknown to the grand jury, to knowingly transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from places in the United States to and through places outside the United States, and to places in the United States from and through places outside the United States:

   (a)  with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud (Title 18, United States Code, Section 1341); wire fraud (Title 18, United States Code, Section 1343); and securities fraud (Title 15, United States Code, Section 78j(b), 17 C.F.R., Section 240.10b-5), in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2; and

   (b)  knowing that the monetary instruments and funds involved in the

transportation, transmission and transfer represented the proceeds of some

form of unlawful activity and knowing that such transportation,

transmission, and transfer was designed in whole or in part to conceal and

disguise the nature, the location, the source, the ownership, and the control

of the proceeds of specified unlawful activity, that is, mail fraud (Title 18,

United States Code, Section 1341); wire fraud (Title 18, United States

Code, Section 1343); and securities fraud (Title 15, United States Code,

Section 78j(b), 17 C.F.R., Section 250.10b-5), in violation of Title 18,

United States Code, Sections 1956(a)(2)(B)(i) and 2.

## MANNER AND MEANS

3.     Among the manner and means by which the defendants MOGILEVICH,

FISHERMAN and BOGATIN, and others known and unknown to the grand jury, caused and

attempted to cause the objectives of the conspiracy to be accomplished, were the following:

### Promotion of Specified Unlawful Activity

4.     The defendants transferred illegal proceeds generated by the scheme to

defraud with the intent to promote the continuation of the scheme and the carrying on of specified

unlawful activities, that is, mail fraud, wire fraud and securities fraud.

### A.     Proceeds from Offerings of YBM Stock

5.     The illegal proceeds generated by the sale of fraudulently inflated stock in

connection with the Special Warrants Offering and the 1997 Offering, as described in the

Introduction to this Superseding Indictment, were used in part to pay overhead, payroll, vendors

and other expenses necessary for the promotion and continued operation of the Network of YBM

companies.

6.    The illegal proceeds from these offerings of YBM stock were deposited into accounts in Canada and later transferred to bank accounts in the Eastern District of Pennsylvania as follows, where funds were then disbursed to pay operating expenses of YBM:

| Date | Description | Transferred from | Transferred to |
|------|-------------|------------------|----------------|
| 11/2/95 | Proceeds totaling approx. $755,555 from Special Warrants Offering. | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc a/c 2006-8360 CoreStates Bank Philadelphia, PA |
| 11/2/95 | Proceeds totaling approx. $134,347 from Special Warrants Offering. | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | YBM Tech. Inc. a/c 0197-5336 CoreStates Bank Philadelphia, PA |
| 11/28/97 - 3/31/98 | Proceeds totaling approx. $2,700,000 from the 1997 Offering. | YBM Magnex International a/c 110-596-4 Royal Bank of Canada Toronto, Canada | YBM Magnex Inc. a/c 2-953-495 Mellon Bank Philadelphia, PA |

**B.    Proceeds Used to Fund Purchase of Arbat**

7.    The illegal proceeds generated by the sale of fraudulently inflated YBM stock, as described in the Introduction to this Superseding Indictment, were funneled to a nominee account and used to fund the purchase of Arbat, which was falsely reported by the defendants to be a profitable, arms-length sale in order to promote and continue the scheme to defraud.

8.    The illegal proceeds were deposited and transferred to and among the bank accounts in the United States, Hungary and elsewhere, including the following:

| Date | Description | Transferred from | Transferred to |
|------|-------------|------------------|----------------|

| | | | |
|---|---|---|---|
| 10/28/96 | Proceeds totaling approx. $150,000 in connection with the purchase of Arbat. | Unindicted Cococonspirator a/c 501-01791-3101-4012 MKB Bank Budapest, Hungary | YBM Magnex Inc. a/c 14108-82581 CoreStates Bank Philadelphia, PA |

### C.    Proceeds From Sale of YBM Stock

9.    To create and promote the false impression that YBM did substantial, highly profitable international business in the industrial magnet market, millions of dollars of illegal proceeds generated by the sale of fraudulently inflated YBM stock were falsely entered on the books and records of UNITED TRADE as customer receipts from magnet sales, and as payments to vendors related to business operations and the production of magnets. The illegal stock proceeds were transferred from nominee brokerage accounts in Canada, through a myriad of nominee bank accounts overseas and in the United States held in the names of purported customers and vendors of United Trade, including the following, among others:

| Date | Description | Transferred from | Transferred to |
|---|---|---|---|
| 5/22/96 | Proceeds totaling approx. $2,072,291. | CBN Trust Co. a/c 24070843 Snoras Bank Lithuania | Technology Dist. Ltd. (TDL) a/c 0001-036613-500 Central-Euro. Int'l Bank Budapest, Hungary |
| 5/31/96 | Proceeds totaling approx. $1,221,255. | TDL a/c 0001-036613-500 Central-Euro. Int'l Bank Budapest, Hungary | CBN Trust Co. a/c 24070843 Snoras Bank Lithuania |

| **Date** | **Description** | **Transferred from** | **Transferred to** |
|---|---|---|---|
| 6/12/96 | Proceeds totaling approx. $3.2 million. | TDL<br>a/c 0001-036613-500<br>Central-Euro. Int'l Bank<br>Budapest, Hungary | Nominee Accounts:<br>• IBS Trading Co.<br>• N.Y. Cotton Corp.<br>• United Nordland Invest.<br>• M. Finance Co. *(FIN & CE Co.)*<br>• Independent Group, Inc.<br>• Whitley Int'l Corp.<br>Chase Manhattan Bank<br>*(formerly Chemical Bank)*<br>Buffalo, New York |
| 10/15/96 | Proceeds totaling approx. $1,499,965. | CBN Trust Co.<br>a/c 24070843<br>Snoras Bank<br>Lithuania | United Trade Ltd.<br>a/c 503-20008-4100-4014<br>MKB Bank<br>Budapest, Hungary |

10.     To disguise the fact that approximately $32 million in customer receipts had been falsely reported on the books and records of UNITED TRADE for 1997, the defendants orchestrated a sell-off of the fraudulently inflated YBM stock in or about March 1998, in order to generate sufficient funds to transfer to the corporate accounts of UNITED TRADE in Canada. Approximately $21.2 million in YBM stock was sold from four brokerage accounts in Canada, which were held in names of nominees and close associates of MOGILEVICH and FISHERMAN. The proceeds were then transferred to foreign bank accounts in Eastern Europe and moved to the UNITED TRADE account in Canada to create the false appearance that these funds had previously existed in the bank account of UNITED TRADE as had been represented on the books and records of UNITED TRADE. Thereafter, the funds were transferred as follows, to and from UNITED TRADE accounts in Canada, Hungary and the United States, on the approximate dates indicated:

| Date | Description | Transferred from | Transferred to |
|---|---|---|---|
| 5/13/98 | Proceeds totaling approx. $28.5 million. | United Trade Ltd. a/c 402-557-3 Royal Bank of Canada Toronto, Canada | United Trade Ltd. a/c 503-20008-4100-4014 MKB Bank Budapest, Hungary |
| 5/26/98 | Proceeds totaling approx. $10 million. | United Trade Ltd. a/c 503-20008-4100-4014 MKB Bank Budapest, Hungary | United Trade Ltd. a/c 8-449-779 Mellon Bank Philadelphia, PA |

## Concealing and Disguising Proceeds
## From Specified Unlawful Activity

11.     Millions of shares of fraudulently inflated YBM stock held in nominee brokerage accounts in Canada were sold, and the illegal proceeds were deposited and transferred to and among various nominee bank accounts controlled by the defendants, knowing the transfers were designed to conceal the true nature, source, ownership and control of proceeds of specified unlawful activities, that is, mail fraud, wire fraud and securities fraud.

### A.     Stock Sales from Arion Investment Club Account

12.     Shares of fraudulently inflated YBM stock held in the "Arion Investment Club" account were sold, as described in the Introduction to this Superseding Indictment, and the proceeds transferred to an overseas bank account held in the name of a nominee for defendant MOGILEVICH and others, as follows:

| Date(s) | Description | Sold & Transferred from | Transferred to |
|---|---|---|---|
| 6/24/96 - 2/4/97 | Proceeds totaling approx. $12.14 million from the sale of over 2.1 million shares of YBM. | Arion Club Account First Marathon Securities Toronto, Canada | Unindicted Coconspirator a/c 501-00152-3101-4014  & a/c 501-00152-3102-4013 MKB Bank Budapest, Hungary |

13.     The funds were then disbursed from the Hungarian bank account in the name of the unindicted coconspirator to the accounts of closely-related entities, individuals and nominees on the behalf of the defendants in order to conceal the nature, source, ownership and control of the proceeds.

### B.     Stock Sales From Anix Investment Club Account

14.     Shares of fraudulently inflated YBM stock held in an "Anix Investment Club" account were sold, as described in the Introduction to this Superseding Indictment, and the proceeds transferred to a nominee bank account in Budapest, Hungary, and disbursed to bank accounts and individuals closely associated with defendant MOGILEVICH, as follows:

| Date(s) | Description | Transferred from | Transferred to |
|---|---|---|---|
| 4/7/98 | Proceeds totaling approx. $1.3 million. | Anix Investment Club Montrose Capital Securities *(Bear Stearns Security Corp.)* New York, New York | Anix Investment Club Ltd. a/c 503-20046-4100-4014 MKB Bank Budapest, Hungary |
| 5/98 - 6/98 | Disbursements totaling approx. $862,300 (from the $1.3 million). | Anix Investment Club Ltd. a/c 503-20046-4100-4014 MKB Bank Budapest, Hungary | Various nominees and closely-related parties/entities. |

### C.     Stock Sales From Griffiths McBurney Accounts

15.     Shares of fraudulently inflated YBM stock held in the brokerage accounts of unindicted coconspirators were sold, as described in the Introduction to this Superseding Indictment, and the proceeds transferred through a myriad of nominee accounts, including accounts in the names of purported customers and vendors of UNITED TRADE, which served as pass-through accounts in order to conceal the nature, source, ownership and control of the stock proceeds:

| Date(s) | Description | Sold & Transferred from | Transferred to |
|---|---|---|---|
| 10/7/96 - 10/9/96 | Proceeds totaling approx. $2.5 million. | Unindicted Coconspirator account at Griffiths McBurney & Partners Toronto, Canada | Nominee Accounts: • United Nordland Invest. • N.Y. Cotton Corp. • M. Finance Co. • Independent Group, Inc. • Whitley Int'l Corp. Chase Manhattan Bank *(formerly Chemical Bank)* Buffalo, New York |
| 2/9/98 | Proceeds totaling approx. $1.9 million. | Nominee account: Sandorne Bodonyi a/c 410-00259-25 Griffiths McBurney Partners | Nominee account: Sandorne Bodonyi/Andrew Gaspar |

16.  Proceeds from the sale of shares of fraudulently inflated YBM stock were transferred from a brokerage account and bank accounts held in the name of an unindicted coconspirator, to Poseidon Investment Club accounts ("PIC") which were controlled by BOGATIN, and ultimately diverted for his personal benefit to bank accounts in the United States and overseas, including the following:

| Date(s) | Description | Transferred from | Transferred to |
|---|---|---|---|
| 5/10/96 - 10/9/96 | Proceeds totaling approx. $187,085. | Unindicted Coconspirator account at Griffiths McBurney Partners Toronto, Canada | Poseidon Investment Club a/c 645-101-745-021 Dean Witter Reynolds Jenkintown, PA |
| 8/12/96 | Proceeds totaling approx. $320,000. | Poseidon Investment Club (V. Alexandroff) a/c 53360E-2/53360F-0 Griffiths McBurney Partners Toronto, Canada | Plakychev a/c 137-120-816 Bank Austria Vienna, Austria |

| Date(s) | Description | Transferred from | Transferred to |
|---|---|---|---|
| 8/14/96 | Proceeds totaling approx. $250,000. | Poseidon Investment Club (V. Alexandroff) a/c 53-360F-0/53-360E-2 Griffiths McBurney Partners Toronto, Canada | Jefferson Gersch, Inc. a/c 2664-845 Mellon PSFS Newtown, PA |
| 12/11/96 | Proceeds totaling approx. $301,797. | Poseidon Investment Club a/c 45-101-745-021 Dean Witter Reynolds Jenkintown, PA | YBM Magnex, Inc. a/c 1410882581 CoreStates Bank Philadelphia, PA |
| 12/27/96 | Proceeds totaling approx. $295,000. | YBM Magnex International a/c 401-060-9 Royal Bank of Canada Toronto, Canada | Kasiopey a/c 137-141-304100200 Bank Austria Vienna, Austria |
| 2/10/97 | Proceeds totaling approx. $396,246. | Poseidon Investment Club (V. Alexandroff) a/c 410-00272-10 Griffiths McBurney Partners Toronto, Canada | Jacob Bogatin a/c P.O. 281-060 Swiss Bank Corp. Zurich, Switzerland |
| 2/10/97 | Proceeds totaling approx. $350,000. | Poseidon Investment Club (V. Alexandroff) a/c 53360E-2/53360F-0 Griffiths McBurney Partners Toronto, Canada | Jefferson Gersch, Inc. a/c 2664-845 Mellon PSFS Newtown, PA |
| 2/13/97 | Proceeds totaling approx. $119,879. | Unindicted Coconspirator a/c 501-00152-3102-4013 MKB Bank Budapest, Hungary | Poseidon Investment Club (V. Alexandroff) a/c 410-00272-10 Griffiths McBurney Partners Toronto, Canada |

17.     Proceeds from the sale of shares of fraudulently inflated YBM stock were also transferred from a brokerage account held in the name of an unindicted coconspirator, through a series of nominee accounts in the names of purported customers and vendors of United Trade, and ultimately diverted to BOGATIN'S personal benefit to an off-shore bank account, including the following:

| Date(s) | Description | Transferred from | Transferred to |
|---------|-------------|------------------|----------------|
| 9/16/96 | Proceeds totaling approx. $100,000. | M. Finance Company a/c 32070288 Snoras Bank Lithuania | Jacob Bogatin ██████████ Barclays Bank Cayman Islands |
| 12/19/96 | Proceeds totaling approx. $100,000. | Jacob Bogatin ██████████ Barclays Bank Cayman Islands | Jacob Bogatin a/c 0404-8829 CoreStates Bank Philadelphia, PA |

All in violation of Title 18, United States Code, Section 1956(h).

## <u>COUNTS THIRTY-SIX THROUGH THIRTY-NINE</u>
### (Money Laundering)

**THE GRAND JURY FURTHER CHARGES:**

1.      Paragraphs 1 through 46 of the Introduction to this Superseding Indictment

and paragraphs 2 through 17 of Count 35 are incorporated by reference herein.

2.      On or about the dates set forth below, in the Eastern District of

Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
   **a/k/a "Simeon Mogilevitch"**
   **a/k/a "Semjon Mogilevcs"**
   **a/k/a "Shimon Makhelwitsch"**
   **a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
   **a/k/a "Yakov"**

knowingly transported, transmitted and transferred, and attempted to transport, transmit and

transfer, monetary instruments and funds, in the approximate amounts below, from a place in the

United States to and through a place outside the United States, and to a place in the United States

from and through a place outside the United States, with the intent to promote the carrying on of

specified unlawful activity, that is, wire fraud, mail fraud and securities fraud, each transfer

constituting a separate count of the Superseding Indictment, Title 18, United States Code, Section

1956(a)(2)(A) and Section 2, as set forth below:

| Count | Date | Description | |
|---|---|---|---|
| **Defendants** | | | |
| 36 | 11/2/95 | Special Warrants Offering: transfer of $682,986 from Royal Bank of Canada (a/c 401060-9) in Toronto, Canada; to YBM MAGNEX payroll account at CoreStates Bank (a/c 2006-8360) in Philadelphia, PA. | MOGILEVICH FISHERMAN BOGATIN |
| 37 | 10/28/96 | Purchase of ARBAT: wire transfer of $150,000 from account of an unindicted coconspirator at MKB Bank (a/c 501-01791-3101-4012), Budapest, Hungary to account of YBM MAGNEX (a/c 14108-82581) at CoreStates Bank, Philadelphia, PA. | MOGILEVICH FISHERMAN BOGATIN |
| 38 | 1/12/98 | 1997 Offering: wire transfer of $1,200,000 from account of YBM MAGNEX INTERNATIONAL, at Royal Bank of Canada, Toronto, Canada to account of YBM MAGNEX, at Mellon Bank, Philadelphia, PA. | MOGILEVICH FISHERMAN BOGATIN |
| 39 | 5/26/98 | Wire transfer of $10 million from account of UNITED TRADE, MKB Bank (503-20008-4100-4014), Budapest, Hungary to account of UNITED TRADE at Mellon Bank (a/c 8-449-779), Philadelphia, PA. | MOGILEVICH FISHERMAN BOGATIN |

All in violation of Title 18, United States Code, Section 1956(a)(2)(A) and Section 2.

## COUNTS FORTY THROUGH FORTY-FIVE
### (Money Laundering)

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.      Paragraphs 1 through 46 of the Introduction to this Superseding Indictment and paragraph 2 through 17 of Count 35 are incorporated herein.

       2.      On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendants

**SEMION MOGILEVICH,**
        **a/k/a "Simeon Mogilevitch"**
        **a/k/a "Semjon Mogilevcs"**
        **a/k/a "Shimon Makhelwitsch"**
        **a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
        **a/k/a "Yakov"**

knowingly transported, transmitted and transferred, and attempted to transport, transmit and transfer, a monetary instrument and funds, in the approximate amounts below, from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission and transfer represented proceeds of some form of unlawful activity and knowing that such transportation, transmission and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, that is, mail fraud, wire fraud and securities fraud, each transfer constituting a separate count of the Superseding Indictment, Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2, as set forth below:

| Count | Date | Description | |
|-------|------|-------------|---|
| **Defendants** | | | |
| 40 | 5/10/96 | Wire transfer of $65,179 from brokerage account of an unindicted coconspirator at Griffiths McBurney, Toronto, Canada to PIC account (a/c 645101745021) in Jenkintown, PA. | MOGILEVICH BOGATIN |
| 41 | 8/14/96 | Wire transfer of $250,000 from brokerage account of V. Alexandroff (a/c 53-360F-0/53-360E 2) at Griffiths McBurney, in Toronto, Canada, to the account of Jefferson Gersch, Inc. (a/c 2664-845) at Mellon PSFS, Newtown, PA. | MOGILEVICH BOGATIN |
| 42 | 10/7/96 | Wire transfer of YBM stock proceeds totaling $500,000, from the brokerage account of an unindicted coconspirator at Griffiths McBurney (a/c 52304-F/a/c 410-00104-14), in Toronto, Canada to M. Finance account (a/c 530-296020) at the Chase Manhattan Bank (formerly Chemical Bank), Buffalo, New York, pursuant to instructions from EDPA. | MOGILEVICH FISHERMAN BOGATIN |
| 43 | 10/9/96 | Wire transfer of YBM stock proceeds totaling $300,000 from the brokerage account of an unindicted coconspirator, at Griffiths McBurney, in Toronto, Canada to Whitley International account (a/c 530-296489) at the Chase Manhattan Bank (formerly Chemical Bank), Buffalo, New York pursuant to instructions from EDPA. | MOGILEVICH FISHERMAN BOGATIN |
| 44 | 12/19/96 | Wire transfer of $100,000 from the account of defendant BOGATIN at Barclays Bank (a/c ▮▮▮▮▮▮▮, Cayman Islands to the account of defendant BOGATIN (a/c 0404-8829) at CoreStates Bank, Philadelphia, PA, for the benefit of defendant BOGATIN. | BOGATIN |

| | | | |
|---|---|---|---|
| 45 | 2/10/97 | Wire transfer of $350,000 from brokerage account of "Poseidon" in c/o V. Alexandroff (a/c 410-00272-10), at Griffiths McBurney, Toronto, Canada to account of Jefferson Gersch, Inc. (a/c 2664-845) at Mellon PSFS, Philadelphia, PA. | BOGATIN |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.

<u>**NOTICE OF FORFEITURE**</u>
**(Racketeering Forfeiture - 18 U.S.C. § 1963)**

**THE GRAND JURY FURTHER CHARGES:**

1.      Paragraphs 1 through 46 of the Introduction to this Superseding Indictment

and Count One are incorporated by reference here.

2.       From in or about 1993, continuously thereafter, up to and including in or

about September 1998, in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
           **a/k/a "Simeon Mogilevitch"**
           **a/k/a "Semjon Mogilevcs"**
           **a/k/a "Shimon Makhelwitsch"**
           **a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN,**
           **a/k/a "Yakov"**
**ANATOLY TSOURA**

violated Title 18, United States Code, Section 1962(d) as alleged in Count One.  Upon conviction

on Count One, each defendant shall forfeit to the United States any interest the defendant has

acquired or maintained in violation of Title 18, United States Code, Section 1962; and any interest

in, security of, claims against, and property and contractual rights affording a source of influence

over, the Enterprise, which the defendant established, operated, controlled, conducted, and

participated in the conduct of, in violation of  Section 1962; and any property constituting and

derived from proceeds, which the defendant obtained, directly or indirectly, from racketeering

activity in violation of Section 1962, including but not limited to, at least the approximate sum of

$32.7 million in proceeds derived from the violation of Title 18, United States Code, Section

1962(d) as alleged in Count One, and all interests and proceeds traceable thereto.

3.      The above-named defendants, and each of them, shall be jointly and severally liable

for the forfeiture obligations as alleged above.

### Substitute Assets

4.       In the event any of the above-described forfeitable property, as a result of any act or omission of the defendant: cannot be located upon the exercise of due diligence; has been transferred to, sold to, or deposited with a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; and  has been commingled with other property which can not be subdivided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Sections 1962(d) and 1963.

## NOTICE OF FORFEITURE
### (Money Laundering Forfeiture - 18 U.S.C. § 982)

**THE GRAND JURY FURTHER CHARGES:**

1.　　Paragraphs 1 through 46 of the Introduction to this Superseding Indictment and Counts Thirty-Five through Forty-Five are incorporated by reference here.

2.　　 From in or about May 1994, and continuously thereafter, up to and including in or about September 1998, in the Eastern District of Pennsylvania and elsewhere, the defendants

**SEMION MOGILEVICH,**
**a/k/a "Simeon Mogilevitch"**
**a/k/a "Semjon Mogilevcs"**
**a/k/a "Shimon Makhelwitsch"**
**a/k/a "Seva"**
**IGOR FISHERMAN,**
**JACOB BOGATIN**
**a/k/a "Yakov"**

violated Title 18, United States Code, Section 1956(a)(2) as alleged in Counts Thirty-Five through Forty-Five

3.　　Upon conviction of violating Title 18, United States Code, Section 1956, as alleged in Counts Thirty-Five through Forty-Five, each defendant shall forfeit to the United States the entirety of the defendant's interest in all property, real and personal, involved in each violation, and any property traceable to such property.

4.　　The property subject to forfeiture includes, but is not limited to, United States currency and its equivalent, in at least the approximate amounts listed below, and all proceeds traceable to such sums, which the defendants obtained directly and indirectly as the result of the violations and which were involved in the violations described in Counts Thirty-Five through Forty-Five:

|  | **Defendant** | **Amount** |
|---|---|---|
| (a) | SEMION MOGILEVICH | $18.4 million |
| (b) | IGOR FISHERMAN | $  3 million |
| (c) | JACOB BOGATIN | $ 10 million |

### Substitute Assets

5.      In the event any of the above-described forfeitable property, as a result of any act or omission of the defendant: cannot be located upon the exercise of due diligence; has been transferred to, sold to, or deposited with a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which can not be subdivided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(2) and Title 21, United States Code, Section 853(p), to seek forfeiture of the assets set forth in these forfeiture allegations as well as any other assets and property of such defendant or defendants up to the total forfeiture.

6.      All defendants shall be jointly and severally liable up to the amount of total forfeitures.

All pursuant to Title 18, United States Code, Sections 1956 and 982.

A TRUE BILL.


_____
FOREPERSON

_____
PATRICK L. MEEHAN
United States Attorney
Eastern District of Pennsylvania